**Robert DOYLE, M.D., Plaintiff,**

v.

**Otis R. BOWEN, M.D., Secretary, United States Department of Health and Human Services, and Richard P. Kusserow, Inspector General, United States Department of Health and Human Services, and Health Care Review, Inc., and John Wakefield, Acting Commissioner, State of Maine Department of Human Services, Defendants.**

**Civ. No. 87–0016 P.**

United States District Court,
D. Maine.

May 22, 1987.

Julian L. Sweet, Thomas J. Valvano, Lewiston, Me., for plaintiff.

David R. Collins, Asst. U.S. Atty., Portland, Me., Clifford Pierce, Office of Regional Counsel, Health and Human Services, Boston, Mass., for defendants Bowen and Kusserow.

Richard G. Bergeron, E. Anne C. Catlin, Asst. Attys. Gen., Augusta, Me., for defendant Ives.

Jerrol Crouter, Drummond & Woodsum, Portland, Me., for defendant Health Care.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

### I.

Plaintiff Robert Doyle, M.D., is a general surgeon who has practiced in Bridgton, Maine since 1973. Approximately fifty percent of Dr. Doyle's income is derived from treating Medicare and Medicaid patients. On September 5, 1986, Health Care Review, Inc. ("HCRI"), the Medicare peer review organization for the State of Maine, issued a report in which it found that Dr. Doyle had on three occasions committed gross and flagrant violations of his statutory duty to meet professionally recognized standards of care in treating Medicare beneficiaries, and in which it recommended that he be excluded from the Medicare program for a minimum of five years. This recommendation was accepted by the Office of the Inspector General ("OIG") on December 31, 1986. Under the applicable statutes, the OIG must publish notice of such a sanction in the local newspaper and inform appropriate hospitals, medical societies, and other public and private organizations within the medical community that the sanction has been imposed. In addition, the sanctioned physician is excluded from participation in his state's Medicaid program.

On January 16, 1987 this Court granted Plaintiff's motion for a temporary restraining order enjoining imposition or publication of the sanction for ten days. The parties subsequently agreed that upon expiration of the temporary restraining order, that portion of the OIG's decision prohibiting Plaintiff from receiving reimbursement for Medicare services would take effect but that notice of the sanction would not be published or disseminated until after this Court's decision in the present case. The Court now renders that decision.

Plaintiff seeks declaratory and injunctive relief, alleging numerous due process violations including bias on the part of HCRI, inadequate notice, failure to provide a meaningful opportunity to be heard, failure to properly consider statutory criteria, and arbitrariness in deciding the length of the sanction. In addition, Plaintiff alleges that post-suspension remedies are flawed and that the term "gross and flagrant violations" is unconstitutionally vague. The Court will address each allegation in turn.[1]

### II.

Adjudication before an unbiased tribunal is a basic requirement of due process. Tribunals should be composed so as to preserve "both the appearance and reality of fairness, 'generating the feeling, so important to a popular government that justice has been done,' *Joint Anti-Facist Committee v. McGrath,* 341 U.S. 123, 172, 71 S.Ct. 624, [649] 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980).

HCRI operates pursuant to a contract with the Health Care Financing Administration, an agency of the United States Department of Health and Human Services. One of its responsibilities is to monitor

---

1. The Court will not address the merits of the decision to sanction Dr. Doyle, which is subject to appeal through the administrative process. The issues that it will address are collateral to the substantive decision and go to the question of whether or not the petitioner received a fair and adequate hearing. Such issues are properly before the Court despite Plaintiff's failure to exhaust administrative remedies. Exhaustion is not necessary when the issues presented are entirely collateral to the substantive claim and where requiring exhaustion would result in irreparable harm to the petitioner. *Mathews v. Eldridge,* 424 U.S. 319, 330–31, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976); *Bowen v. City of New York,* —— U.S. ——, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). The Court concludes that publication of notice of the sanctions against Plaintiff would cause him irreparable harm by damaging his reputation and causing concern in the minds of referring physicians and his current and prospective patients about his medical competence.

the care received by Medicare patients so as to insure that minimum standards of quality are met. HCRI employs nurses to review the medical charts of approximately twenty-five to thirty percent of all Medicare patients. The nurses are required to review every chart pertaining to certain diagnoses and then to review other charts that are selected at random by computer. If the nurse reviewer is troubled by a chart, it is referred to a physician reviewer. If the physician agrees that the chart evidences substandard medical care, it is forwarded to the Maine Quality Committee. The record indicates that Dr. Doyle's cases were reviewed at this level by four physicians including a member of the Committee, a surgeon, and two members of the Maine Advisory Committee ("Committee" or "Advisory Committee"). The Quality Committee found that in seven instances Dr. Doyle may have committed a sanctionable offense, and it forwarded those cases to the Maine Advisory Committee. The Maine Advisory Committee agreed that it would issue a finding of a gross and flagrant violation only upon a unanimous vote of its six members, and on May 22, 1986, after review of the seven cases, it reached a tentative conclusion that such violations had occurred in three of the cases reviewed.

On June 11, 1986, Maine Advisory Committee Chairman Franklin Bragg, M.D., sent Dr. Doyle a letter notifying him of the Committee's preliminary conclusion and its preliminary decision to recommend to OIG a five-year exclusion from the Medicare program. Dr. Bragg invited Dr. Doyle to submit information that he felt might cause the Committee to modify its position and/or to request a meeting with the Committee. Dr. Doyle did request such a meeting and was informed that he would be entitled to bring to the meeting any documents and any witnesses whom he wished to have speak on his behalf.

The meeting was held on August 14, 1986 and was attended by Plaintiff and his attorney, four of the six members of the Advisory Committee, counsel for the Advisory Committee, and a number of HCRI administrators. Dr. Doyle did not present any witnesses or provide any documentary evidence, but he did discuss each of the three cases with the physicians present; these discussions were recorded and later transcribed by a stenographer and forwarded to the two members of the Committee who did not attend. This meeting lasted approximately two hours and was followed by approximately fifty minutes of closed deliberations by the four Committee members.[2] This portion of the proceeding was not recorded. The four members of the Committee present unanimously agreed to recommend a five-year exclusion to OIG, and this decision was later endorsed by the two absent members. Dr. Doyle was informed of the Committee's decision and was given an opportunity to submit information to OIG. After receiving Dr. Doyle's submissions and conducting its own analysis, OIG adopted HCRI's recommendation of a five-year exclusion.

Plaintiff states three bases for his claim of bias. He alleges that HCRI is required to perform both a prosecutorial function in identifying sanctionable cases and a judicial function in hearing a physician's defense of his performance, and that once it has identified cases as sanctionable, HCRI is predisposed to favor its original conclusion and unable to fairly evaluate a practitioner's defense. Plaintiff also alleges that HCRI was in danger of losing its contract and needed to impose a sanction to maintain its credibility, and that Committee members therefore had a personal monetary stake in voting to sanction. Finally, Plaintiff argues that he had long had an antagonistic relationship with HCRI and that the organization had a personal bias against him.

■ Plaintiff's first theory for establishing bias is foreclosed by *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). The Supreme Court held in

---

**2.** The deliberative session was also attended by several HCRI administrators and by HCRI's attorney; these other observers did not vote and according to HCRI President Frederick Crisafulli, M.D., participated only minimally in the deliberations.

that case that there is no *per se* rule precluding one body from performing both investigatory and judicial functions. This Court therefore rejects Plaintiff's contention that the mere fact that Maine Advisory Committee members were involved in reaching the initial decision to sanction rendered them unable to fairly evaluate Dr. Doyle's defense of his actions. It now turns to Plaintiff's other allegations to determine whether the Plaintiff has produced sufficient evidence to prove actual bias in the proceedings against him.

■ The Court concludes that Plaintiff has failed to prove that the deliberations regarding his medical treatment were affected by HCRI's concern about having its contract renewed. It is true that HCRI and other medical peer review organizations were informed by the federal government that one of the criteria by which they would be evaluated would be their ability to identify substandard care and to sanction the physicians involved. It was never suggested, however, that HCRI should sanction physicians who were providing adequate care. Plaintiff has offered some evidence that HCRI administrators were concerned about whether they were meeting their responsibilities in this area,[3] but he has not presented a scintilla of evidence that the nurse reviewer or the physician reviewers who were involved in evaluating his care were influenced by, or were even particularly aware of, this concern. Plaintiff has offered no evidence that the physicians involved in the process are even paid by HCRI and certainly has not suggested that if they are paid, their remuneration as reviewers exceeds what they would earn by

practicing medicine during the time that they spend serving the peer review process. Absent a showing to the contrary, these professionals charged with evaluating their peers in the interest of maintaining an acceptable level of care for Medicare patients must be assumed to be doing their job in a fair and conscientious manner. The general concern among HCRI administrators that the organization fulfill its responsibility to identify and address quality problems is not an improper one and does not lead to an inference that the organization was corrupt in carrying out its mandate.

■ The Court finds Plaintiff's final allegation of bias, that HCRI members had a vendetta against him, to be the most troubling of the three. Dr. Doyle is the first physician ever sanctioned by HCRI, and in fact is the first physician to be sanctioned by any peer review organization in all of New England. Although it falls far short of being substantive proof of any impropriety, the Court is nevertheless given some pause by the fact that the first physician to be sanctioned by HCRI is someone who is well known to that organization and who has been one of the most vocal critics of its operations in Maine. The Court is particularly troubled by the testimony of former HCRI Medical Director Michael Lacombe that when HCRI Vice President Edward Lynch was told that Doyle's opposition was making it difficult to recruit physician reviewers in Bridgton, Lynch suggested doing a review of every Medicare patient treated by Dr. Doyle so as to make him "feel the heat." Although this complete review never took place,[4] it is clear

3. Dr. Michael LaCombe testified that in the fall of 1985, during his tenure as medical director of HCRI, he received memoranda and other communications from the federal government that indicated to him that renewal of HCRI's contract in Maine "was going to depend in part on the number and strength of their sanctions against physicians and hospitals." In addition, both Dr. Crisafulli and Edward Lynch, HCRI Vice President, testified that they knew that the government would evaluate HCRI's sanctioning process in deciding whether to renew its contract.

4. From January of 1985 through April of 1986, Dr. Doyle was the surgeon, attending physician,

or both for 330 Medicare discharges; HCRI reviewed 155 of these, or approximately 47%. The record indicates that, on average, approximately 25% to 30% of all Medicare discharges are reviewed, but that because the process selects certain diagnoses for automatic review, the percentage of cases reviewed for any individual physician will vary with that physician's patient mix. The Court notes that Dr. Doyle was audited at a rate far above average, but it has heard no evidence that his cases were not selected for review on the same basis as all other physicians and that he did not simply have a higher percentage of patients with those diagnoses that are automatically reviewed.

that Lynch and perhaps other HCRI administrators considered Doyle to be a thorn in their sides.[5]

The Court is also concerned by an item that appeared on the agenda of the May 22, 1986 meeting at which the Maine Advisory Committee made its preliminary decision to find that Dr. Doyle was in gross and flagrant violation of his duty to provide quality care. The agenda indicates, and witnesses have confirmed, that the Committee discussed "Relationship between Health Care Review, Inc./Practitioner." Committee Chairman Dr. Franklin Bragg testified that "it was discussed that Dr. Doyle was among several vocal critics of Health Care Review process in Maine, and the fact that that had no bearing on our decision about the sanction-ability of these records or whether sanctions should be administered." Clearly the details of Dr. Doyle's relationship with HCRI are wholly irrelevant to any evaluation of his medical care, and were this Court to find that HCRI was influenced by that relationship when it recommended that Dr. Doyle be sanctioned, it would set aside the entire process as tainted with bias. The evidence before the Court, however, does not support such a finding.

Dr. Bragg's uncontroverted testimony was that the Committee properly concluded that Dr. Doyle's criticism of HCRI should not be considered in reviewing his medical records. Furthermore, the evidence establishes that Dr. Doyle's records reached the Committee only after being identified as potentially suspect by a nurse reviewer, a physician reviewer, and four physicians serving the Maine Quality Committee. The

Maine Advisory Committee agreed to designate a violation as "gross and flagrant" only upon a unanimous vote of all six members. Given the multi-layered nature of the process, the unanimity of the persons involved, and the lack of any evidence of bias on the part of any of the physicians involved in the process, the Court concludes that the case for imposition of sanctions against Dr. Doyle was evaluated by an impartial tribunal.

### III.

The notice and hearing provided to Plaintiff fully comported with the requirements of due process. Dr. Doyle was informed by the letter of June 11 of the charges against him and of the sanction being considered. He was provided with a summary of each case involved, a statement detailing the areas of treatment that concerned the reviewers, and a complete set of the medical records from which the reviewers had drawn their conclusions. He was informed of his right to submit additional information and his right to appear before the Committee. He was later informed that he had a right to bring witnesses before the Committee. This notice fully satisfies the requirements of due process.[6]

Similarly, the August 14 hearing itself comported with due process in that it provided Dr. Doyle an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). It is well established

---

**5.** Dr. Doyle wrote a number of less than courteous letters to HCRI personnel, and Dr. LaCombe testified that he and Mr. Lynch had discussed these letters and the fact that they were bothersome. In addition, the record indicates that Dr. Doyle had a poor relationship with Charlotte Munsey, the HCRI nurse coordinator at his hospital, and in fact had requested that she be removed from that position.

**6.** Dr. Doyle has argued that the notice he received was insufficient because he was not informed that the Maine Advisory Committee would meet alone with him if he responded on his own behalf but that they would have a

lawyer present if his response was made through counsel. The Court finds this objection to be without merit. The notice required by due process need not include a comprehensive catalog of all options available to each participant. The primary requirement of due process is that notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). *See also Dionne v. Bouley*, 757 F.2d 1344 (1st Cir.1985).

that the requirements of due process vary depending upon the strength of the private interest affected, the risk of erroneous deprivation and the value of additional or substitute procedural safeguards, and finally, the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903.

In only one instance has the Supreme Court found that due process required a full pre-termination evidentiary hearing; the Court held that such a hearing was required before welfare benefits could be terminated, because in that case an erroneous decision could deprive a citizen of the basic necessities of life and a means to survive while awaiting a post-termination hearing. *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). The Court has declined to require such a procedure prior to other quite serious deprivations, including the termination of disability benefits for disabled workers, *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and the termination of employment for civil servants who could be released only for cause. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). In *Loudermill*, the Court held:

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id.* at 546, 105 S.Ct. 1495 (citations omitted). The Court also stated that "in general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action," *id.* at 545, 105 S.Ct.

at 1495, and that "the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S.Ct. at 1495 (citations omitted).

This Court concludes that the process afforded Plaintiff in the current case was sufficient. Although the private interest here is a strong one, it is less compelling than the interests held by the petitioners in *Eldridge* and *Loudermill*, as the Plaintiff in this case derives only approximately half of his income from treating Medicare and Medicaid patients. The Court finds that the government has a strong interest in moving expeditiously to protect Medicare patients from incompetent care, and that the procedures followed were such as to minimize the possibility of an erroneous decision and to make it unlikely that additional procedures would be of significant value in that respect. Plaintiff had an opportunity to be heard, to present documentary evidence and live witnesses, to benefit from the representation of counsel, to challenge the findings against him, and to defend the challenged medical decisions that he had made. The dictates of due process were fully satisfied.

### IV.

The federal regulation regarding determination of a sanction provides:

> The PRO's *specific recommendation* must be *based on* a consideration of—
>
> (a) The type of offense involved;
>
> (b) The severity of the offense;
>
> (c) The deterrent value;
>
> (d) The practitioner's or other person's previous sanction record;
>
> (e) The availability of alternative sources of services in the community; and
>
> (f) Any other factors that the PRO considers relevant (for example, the duration of the problem).

42 C.F.R. § 1004.80 (emphasis added).[7] The Court concludes that HCRI failed to base its recommendation of a five-year sanction on a consideration of these factors and that, therefore, the sanction is invalid.[8]

The evidence supports Plaintiff's contention that the initial decision to impose a five-year exclusion was made arbitrarily, was not made by the Committee as a whole, and was not made in accordance with section 1004.80. Furthermore, the Court concludes that while some of the factors listed in the regulation may have been touched upon in passing, and while the Committee's final report does contain reference to these factors, at no point did the Committee comply with its statutory mandate to *base its specific recommendation on a consideration of* the section 1004.80 factors.

The Maine Advisory Committee first considered Dr. Doyle's case on May 22, 1986, the meeting at which it unanimously agreed that he had grossly and flagrantly violated his statutory obligations in three separate cases. The minutes of that meeting do not reflect that the Committee reached any decision on what sanction to impose, nor do they indicate that the Committee discussed the section 1004.80 criteria; Mr. Lynch testified that the Committee adjourned its May 22 meeting without anyone having formulated an opinion as to the proper length of an appropriate sanction. The Court discounts Dr. Bragg's testimony to the contrary, noting that it is in direct conflict with his deposition testimony,[9] and finds that the May 22 meeting adjourned without the Committee even considering specific proposals for an appropriate sanction.

Dr. Bragg testified that the following week he and another Committee member met with an OIG official to seek guidance on the formulation of a sanction. Dr. Bragg testified that the Committee members, having never imposed sanctions be-

---

7. The PRO must also include in its recommendation a finding as to whether or not the practitioner "is unable or unwilling substantially to comply with the obligation that was violated." 42 C.F.R. § 1004.70(c)(4).

8. The Court is aware of the dicta in *Bowen v. City of New York*, 106 S.Ct. at 2032, indicating that "mere deviation from the applicable regulations in [a] particular administrative proceeding" is "fully correctable upon subsequent administrative review since the claimant on appeal will alert the agency to the alleged deviation.... Thus, our holding today does not suggest that exhaustion is to be excused whenever a claimant alleges an irregularity in the agency proceedings." *Id.* In this Court's view, the present case does not concern a "mere deviation from the applicable regulations" but rather a failure to apply the proper criteria at all. The statutory scheme contemplates that there be an initial, reasoned determination of a sanction at the peer review level with reviewers applying a set criteria, and that the reviewers' decision then be subject to administrative appeal. In this case, the peer reviewers essentially abdicated their responsibility to perform the first step in the process. Such a situation is markedly different from one in which the proper standard is applied and the only question is whether or not the reviewer interpreted the standard correctly. In the present case, the interests of justice will be best served by requiring the Maine Advisory Committee to reconvene for the express purpose of arriving at a sanction through a proper consideration of the section 1004.80 criteria.

9. Dr. Bragg testified on direct examination that the Committee reached a tentative decision to recommend a five-year exclusion at its May 22nd meeting. The following exchange ensued on cross-examination by Mr. Sweet, attorney for the Plaintiff:

MR. SWEET: Dr. Bragg, do you remember my taking your deposition in Bangor at Health Care Review's office February 3rd 1987?

DR. BRAGG: Yes.

MR. SWEET: And do you recall my asking you the question: ["]Do you remember discussing with members of the Advisory Board, what an appropriate sanction would be in this particular case at the meeting of May 22nd?["] Answer: ["]I don't remember.["] Question: ["]If a determination had been made that a particular sanction was appropriate, would that determination be reflected in those minutes?["] Answer: ["]Oh, I think so.["]

Page 42, lines 1 through 8. Do you remember that?

DR. BRAGG: Yes.

. . . .

MR. SWEET: During your deposition at page 42 line 18, I asked you: At the close of the May 22nd meeting, ["]You had not established any particular sanction as of this point in time?["] And the answer: ["]I think that's correct.["] Do you remember that?

DR. BRAGG: Yes.

MR. SWEET: And that again was simply a failure of recollection?

DR. BRAGG: Exactly.

fore, felt that they needed guidance in determining an appropriate sanction and that he was disappointed that the OIG had little useful information to impart. He testified: "I recall distinctly walking away from this meeting thinking, gee, I didn't get the help I went there looking for." Dr. Bragg testified that the Committee did not meet again before he sent the June 11 letter informing Dr. Doyle that a five-year sanction was being considered, nor did the members conference by telephone. The Court must therefore conclude that the original decision to recommend a five-year sanction, far from being a product of deliberation on the section 1004.80 criteria, was not even made by the full Committee. The only person who unquestionably participated in the decision was Dr. Bragg, whose name was on the letter to Dr. Doyle, and he has testified that shortly before sending the letter he was uncertain of how to arrive at a sanction and dissatisfied with the only outside assistance he was given.

It is also clear to the Court that the initial decision to impose a five-year sanction was not based on a proper application of the section 1004.80 criteria, and that this initial defect was never cured. Witnesses for the defense testified under examination by defense counsel that most of the relevant factors were at least touched on at the August 14 meeting at which a final decision to sanction was reached, but their testimony was vague and sometimes contradictory,[10] and the Court finds it generally unpersuasive.

The Court also finds it probative that the entire deliberation of August 14 lasted only fifty minutes, and that a substantial portion of that time was spent discussing the medical issues raised by Dr. Doyle's two-hour defense of his actions, which had occurred immediately prior to the Committee's deliberative session. The statute does not require that committee members deliberate for any specific length of time, but when the outside perimeters for the period during which deliberations could have taken place are reduced to only a few minutes, it casts further doubt on whether the analysis required by statute ever took place. After a consideration of all of the evidence, and after making appropriate credibility judgments, the Court concludes that HCRI's specific recommendation of a five-year exclusion as a sanction was arbitrarily determined in the first instance, was not based on the factors delineated in section 1004.80, and that these defects were not cured by the Committee's deliberations at the meeting of August 14.

## V.

■ The Court rejects Plaintiff's claim that the statute under which he was sanctioned is unconstitutionally vague. Plaintiff argues that he could not be expected to know what would constitute a "gross and flagrant" violation of his obligation to provide medical treatment "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c–5(a), (b)(1). He argues that this alleged vagueness is not cured by the definition provided in 42 C.F.R. § 1004.1(b): " 'Gross and flagrant violation' means a violation of an obligation has occurred in one or more instances which presents an imminent danger to the health, safety or well-being of a Medicare beneficiary or places the beneficiary unnecessarily in high-risk situations."

A statute must be found void for vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application...." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). A

---

**10.** Mr. Lynch testified that he did not recall any discussion of deterrence, but Drs. Bragg and Crisafulli testified that deterrence was discussed. Mr. Lynch testified that there was an "intense discussion" of Dr. Doyle's lack of willingness or ability to conform his conduct to the requirements of the Medicare regulations, but he was unable to recall any details of it. Although the witnesses who had been present at the August 14th deliberative session generally answered "yes" when their counsel went through the statutory criteria point by point and asked them if discussion on each item had occurred, they rarely volunteered additional information, and when asked to elaborate, they had very little recall of either the substance or the details of the deliberations.

statute must be found unconstitutionally vague on its face if its terms are so general that "no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). Some lack of precision may be necessary to enable a statute "to embrace all of its legitimately intended objectives without [becoming] encyclopedic and unwieldy", *Fantasy Book Shop, Inc. v. City of Boston,* 652 F.2d 1115, 1123 (1st Cir.1981), and a statute will not be found to be unconstitutionally vague on its face as long as it has "a core meaning that can reasonably be understood." *Brache v. County of Westchester,* 658 F.2d 47, 51 (2d Cir.1981). *See Bangor Baptist Church v. State of Maine,* 549 F.Supp. 1208 (D.Me. 1982) (per Cyr, J.).

Applying the standards enunciated above, the Court concludes that the statute in question is not unconstitutionally vague. Any attempt to catalog every medical practice that would fall into the prohibited category would result in the sort of encyclopedic and unwieldy statute rejected as unnecessary by *Fantasy Book Shop.* The clear intention of the statute is that sanctions be available where medical care is found to be plainly and substantially below professionally recognized standards, and a person of average intelligence, especially a licensed medical practitioner, should have no difficulty in taking such a meaning from it. The language in section 1004(b) is equally clear: it plainly requires that a gross and flagrant violation be found when substandard medical care unnecessarily places a patient in danger.

### VI.

■ Finally, Plaintiff argues that regulations promulgated at 42 C.F.R. § 1004.-130(a)(2) preclude the *de novo* evidentiary review mandated by 42 U.S.C. § 405(b) by limiting the evidence that the presiding administrative law judge may consider to that which was submitted to the OIG within thirty days following HCRI's notification of its sanction recommendation. The Court concludes that this issue is not currently justiciable.

In *Shell Oil Co. v. Noel,* the First Circuit stated:

To meet the standards of the Declaratory Judgment Act and indeed of Article III of the Constitution there must be a "live and acute controversy," *Steffel v. Thompson, supra,* 415 U.S. [452] at p. 459, 94 S.Ct. 1209 [at p. 1215, 39 L.Ed.2d 505 (1974)]. "Basically, the question in each case is whether ... there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). If a complaint fails to allege, or plaintiff fails to prove, that defendant state officers have ever taken or threatened to take any action with respect to a state statute then there is no "actual controversy" within the Declaratory Judgment Act, and there is "no case or controversy" within Article III. *Steffel v. Thompson,* 415 U.S. [452] at pp. 459, 476, 94 S.Ct. 1209 [at pp. 1215, 1224, 39 L.Ed.2d 505].

608 F.2d 208, 213 (1st Cir.1979).

In the current case, Plaintiff has not submitted any evidence indicating that the administrative law judge who will hear his appeal on the merits disagrees with his interpretation of the statute and will deny him the *de novo* hearing to which he believes he is entitled. There is, therefore, no "live and acute controversy" at this time.

### VII.

Accordingly, it is ORDERED that enforcement and publication of Plaintiff's five-year exclusion from the Medicare program be, and it is hereby, permanently enjoined; that HCRI convene a meeting of the Maine Advisory Committee and that that group reach a sanction recommendation that is based on a consideration of the criteria delineated in 42 C.F.R. § 1004.80; and that once such a recommendation is reached, the Committee prepare a report of its deliberations and cause to be followed the remaining steps mandated by statute.