Jai K. VARANDANI, Appellee,

v.

Otis R. BOWEN, Secretary, Department of Health and Human Services, Appellant,

and

The Medical Society of Virginia Review Organization, Inc., Defendant.

No. 86–2603.

United States Court of Appeals, Fourth Circuit.

Argued April 8, 1987.

Decided July 28, 1987.

Rehearing Denied Sept. 30, 1987.

Robert V. Zener, Civil Div., Dept. of Justice (Richard K. Willard, Asst. Atty. Gen., Washington, D.C., John Perry Alderman,

U.S. Atty., Roanoke, Va., John F. Cordes, Civil Div., Dept. of Justice, Washington, D.C., on brief), for appellant.

Martin Andrew Donlan, Jr. (Peter M. Mellette, Crews & Hancock, Richmond, Va., on brief), for appellee.

Before WINTER, Chief Judge, SPROUSE, Circuit Judge and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Plaintiff, Dr. Jai K. Varandani, brought suit to enjoin the Secretary of Health and Human Services ("the Secretary") from suspending him for one year from receiving reimbursement for services rendered to Medicare patients. Dr. Varandani alleged, *inter alia,* that the threatened suspension would violate procedural due process and that the statutory standard for suspension is unconstitutionally vague. The district court preliminarily enjoined the suspension on the grounds that Dr. Varandani had raised "serious questions" as to the constitutionality of the suspension. The Secretary appeals and we reverse.

## I.

Dr. Varandani is a physician licensed to practice medicine in Virginia. He has a provider agreement with Medicare under which he treats Medicare beneficiaries and receives reimbursement for his services. He is one of two specialists in internal medicine in general practice in Lee County, Virginia, an area targeted by the federal government as medically underserved, and he is a member in good standing of the medical staff at Lee County Community Hospital.

Doctors receiving Medicare reimbursement have a statutory obligation to provide services "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c–5(a)(2). Sanctions and penalties for breach of this duty and the procedure for determining them are set forth in § 1320c–5. As a first step in the statutory procedure, an agent of the Medical Society of Virginia Review Organization (the "MSVRO") wrote Dr. Varandani on April 19, 1985 and advised him that the MSVRO was reviewing his treatment of a patient in October and November 1984. On September 4, 1985, the chairman of a regional advisory committee of the MSVRO wrote Dr. Varandani asking that he attend a committee meeting at a public restaurant on October 9 to discuss the "specifics" of the medical treatment in question. Dr. Varandani was unable to attend the meeting; his complaint alleges that he repeatedly attempted to notify the regional committee chairman of a schedule conflict and that the chairman did not return his calls until the day of the meeting. The meeting went forward without Dr. Varandani, and the regional committee decided to refer the case to the state-level MSVRO.

Four weeks later, on December 9, 1985, the Quality Assurance Committee of the state-level MSVRO convened a meeting to consider the case. Dr. Varandani was not present. The Committee determined that Dr. Varandani had "grossly and fragrantly violated" his statutory obligation to provide competent medical care to the Medicare patient he treated in October and November 1984. *See* 42 U.S.C. § 1320c–5(a)(2). The Committee sent Dr. Varandani a letter advising him of this determination and of its intention to recommend sanctions to the Secretary. The letter also invited Dr. Varandani to submit "additional information" within 30 days and to request a meeting with the Committee to "review and discuss case specifics." An attachment to the letter entitled "issues of Concern to MSVRO" listed a number of medical decisions taken by Dr. Varandani while treating the patient in question.

Finally, in February, 1986, Dr. Varandani appeared before the Committee in a meeting at the MSVRO Conference Room. He submitted a booklet describing his version of the case, gave a lengthy oral explanation of the treatment he administered, and engaged in a detailed technical discussion with members of the Committee on the "issues of concern" listed in the attachment to the Committee's earlier letter. He alleges that he was interrupted before he could finish his oral presentation and that

the Committee cross-examined him instead of debating the issues with him. Although Dr. Varandani was accompanied by his attorney and by the administrator of Lee County Community Hospital, neither of these people was allowed to speak. The Committee did not make a verbatim transcript of the meeting but it did keep written minutes of the proceedings. After the meeting, the Committee concluded that Dr. Varandani's explanations were inadequate, and it referred the case to the Office of the Inspector General of the Department of Health and Human Services (OIG) with a recommendation that Dr. Varandani be suspended from receiving Medicare reimbursement for six months.

OIG adopted the MSVRO's recommendation of suspension, but it lengthened the suspension from six months to one year on the grounds that Dr. Varandani's medical errors were particularly egregious and on the grounds that there are enough physicians in the Pennington Gap area to care for the patient population. On May 22, 1986, OIG wrote Dr. Varandani and advised him of his right to a full adversary *de novo* hearing on the case. *See* 42 U.S.C. § 1320c–5(b)(4); 42 C.F.R. §§ 405.1501(f), 405.1530 *et seq.* OIG also informed Dr. Varandani that the suspension would take effect within 15 days of receipt of OIG's letter, well before the *de novo* hearing could take place, and that notice of the suspension would be published in a local newspaper in accordance with 42 C.F.R. § 474.52(d) (1985), *now codified at* 42 C.F.R. § 1004.100(d) (1986). Dr. Varandani filed this suit just before the suspension became effective, and the district court preliminarily enjoined the suspension. The Secretary now appeals.

## II.

We turn first to the procedural due process claim. The Secretary argues that the district court lacked jurisdiction to hear this claim, since under 42 U.S.C. § 405(g) a suspended physician is entitled to judicial review only after a "final decision" by the Secretary—that is, only after the *de novo* hearing and administrative appeal are com-

plete. The Supreme Court, however, has held that the requirement of a "final decision" may be waived if the plaintiff asserts a "colorable" constitutional claim that is "collateral" to the merits. *Mathews v. Eldridge*, 424 U.S. 319, 330–31, 96 S.Ct. 893, 900–01, 47 L.Ed.2d 18 (1976). The rationale for this rule, at least as to procedural due process claims, is that a "preliminary" administrative decision to deprive an individual of property may cause irreparable harm that cannot be rectified by a postdeprivation hearing, and thus that the "preliminary" decision is in fact "final." *Id.* at 331–32, 96 S.Ct. at 900–01; *Ram v. Heckler*, 792 F.2d 444, 446 (4 Cir.1986).

■ We are not convinced that Dr. Varandani has raised a "colorable" procedural due process claim sufficient to establish jurisdiction. Even if we assume that he has a liberty interest in protecting his good name from the tarnishment that would result from official publication of the suspension, *see Koerpel v. Heckler*, 797 F.2d 858, 866 (10 Cir.1986), we are doubtful that he has a "colorable" claim that he has been denied procedural due process. He received notice of the impending suspension, an opportunity to respond in writing, and an opportunity to respond in person at an informal hearing. At least two circuits have held that a doctor may be suspended from Medicare reimbursement after receiving notice and an informal hearing, *see Koerpel*, 797 F.2d at 869; *Ritter v. Cohen*, 797 F.2d 119 (3 Cir.1986), and no case of which we are aware holds that a doctor is entitled to a formal, pre-suspension evidentiary hearing.

■ But even if Dr. Varandani's due process claim is sufficiently "colorable" to establish jurisdiction, we think it should be rejected on the merits. The standard for determining what process is due is set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), which held that a court should examine the private party's interest in greater procedural protection, the government's interest in avoiding delay, and the risk that lesser procedures will produce an erroneous deprivation. Applying this standard, the courts

have refused to require anything more than an informal hearing before a doctor is suspended from Medicare reimbursement in large part because of the interest of Medicare patients in not being treated by a doctor found by his peers to have engaged in grossly substandard practice. *See Koerpel,* 797 F.2d at 869; *Ritter,* 797 F.2d at 123–24. *See also Ram v. Heckler, supra* (formal pre-suspension hearing not required where doctor was convicted of Medicare fraud). Dr. Varandani distinguishes *Koerpel* on the ground that the physician in that case had an opportunity to meet with a representative of OIG before the suspension took effect. We think it sufficient that the peer-review organization, which recommends a sanction to OIG, met with Dr. Varandani before it recommended that he be suspended. A meeting with OIG would reduce the risk of erroneous deprivation only marginally; in our view, this insignificant improvement in the accuracy of pre-suspension proceedings would not outweigh the government's very strong interest in quick action to protect Medicare patients from incompetent physicians.

■ Nor do we think it fatal to the Secretary's case that the MSVRO forbade Dr. Varandani's attorney to speak at the informal hearing. While it might be preferable to allow an attorney to speak on behalf of the doctor at a pre-suspension hearing, we think it sufficient that Doctor Varandani was allowed to have his attorney present to observe the proceedings. As we have already observed, no cases hold that a doctor is entitled to a full adversary hearing before being suspended from participation in Medicare. And as the Supreme Court has said in a case involving the dismissal of a full-time employee, a pre-termination hearing "need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985).

Related cases support our conclusion that an informal presuspension hearing before a peer-review organization satisfies due process. At least three circuits have held that health-care providers such as hospitals are not entitled to an evidentiary hearing before they are suspended from receiving Medicare reimbursements. *See e.q., Northlake Community Hospital v. United States,* 654 F.2d 1234 (7 Cir.1981); *Case v. Weinberger,* 523 F.2d 602, 606–09 (2 Cir.1975); *Geriatrics Inc. v. Harris,* 640 F.2d 262, 265 (10 Cir.1981). *See also Town Court Nursing Center Inc. v. Beal,* 586 F.2d 266, 277–78 (3 Cir.1978) (in banc). The rationale for these holdings is that the government's compelling interest in assuring safe health care for the public, as well as its interest in avoiding the extra costs of pre-deprivation hearings, outweighs the doctor's concededly strong interest in protecting his reputation and medical practice. We endorse that rationale, and we thus conclude that Dr. Varandani's right to procedural due process was not violated.

### III.

We next consider Dr. Varandani's claim that the applicable statute and regulations are unconstitutionally vague. In our view, this claim lacks merit and provides no "colorable" basis on which to ground jurisdiction.

The statute regulating treatment of Medicare patients authorizes the Secretary to suspend a doctor from receiving reimbursement if the doctor has "grossly and flagrantly violated" the obligation to provide care "of a quality which meets professionally recognized standards of health care." 42 U.S.C. §§ 1320c–5(b)(1)(B), 1320c–5(a)(2). The regulations define a "gross and flagrant violation" as

> a violation of an obligation [which] has occurred in one or more instances which presents an imminent danger to the health, safety or well-being of a Medicare beneficiary or places the beneficiary unnecessarily in high-risk situations.

42 C.F.R. § 1004.1(b) (1986), *formerly codified at* 42 C.F.R. § 474.0(b) (1985).

■ We do not think these standards are unconstitutionally vague. The definition of adequate medical care cannot be boiled down to a precise mathematical formula; it must be grounded in what, from time to time, other health professionals consider to be acceptable standards of health care. *Cf. McLean Trucking Co. v. Occupational Safety & Health Review Comm'n,* 503 F.2d 8, 11 (4 Cir.1974) (holding that application of "reasonable man" standard "eliminates to a large degree the alleged facial vagueness" in a statute) (footnote omitted). Furthermore, we note that the statute at issue fixes a civil sanction, not a criminal one, and that it does not infringe on First Amendment interests.

■ Dr. Varandani argues that even if the statute is not unconstitutionally vague, the governing regulation is invalid because it defines a violation of medical standards in terms of risk of harm to the patient, not in terms of the doctor's deviation from accepted standard of health care. We disagree. The regulation defines a "gross and flagrant violation" as a "violation of an *obligation* " that has caused harm or risk of harm. 42 C.F.R. § 1004.1(b) (1986) (emphasis added). The regulation thus incorporates the statute's definition of an "obligation," which looks to prevailing medical standards: "it shall be the obligation of any health care practitioner ... [to provide care] of a quality which meets professionally recognized standards of health care." 42 U.S.C. §§ 1320c–5(a), 1320c–5(a)(1). The regulation merely adds that a "gross and flagrant" violation of an obligation is a violation of an obligation which puts the patient in "imminent danger" or in "high-risk situations." In other words, the regulation defines a gross and flagrant violation as an especially dangerous deviation from medical norms. We think this formulation is as clear as can be expected, and we conclude that the regulation is valid and that the statute is not unconstitutionally vague.

## IV.

After argument, we were advised that the Secretary has recently amended the guidelines for peer-review organizations so as to require greater procedural protection before doctors are suspended from Medicare reimbursement. Dr. Varandani argues that these regulations were not followed and that the case should be remanded for administrative proceedings that comply with the new rules.

At the outset, we are not convinced that this claim is "collateral" to the merits, *Mathews,* 424 U.S. at 330–31, 96 S.Ct. at 900–01, and therefore we doubt that it justifies judicial review before a "final decision" of the Secretary. 42 U.S.C. § 405(g). The Supreme Court has held that a claim is not "collateral" to the merits, and therefore does not support premature judicial intervention, if it alleges "mere deviation from the applicable regulations in [the claimant's] particular administrative proceeding." *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986). The Court added that

> [i]n the normal course, such individual errors are fully correctable upon subsequent administrative review since the claimant on appeal will alert the agency to the alleged deviation. Because of the agency's expertise in administering its own regulations, the agency ordinarily should be given the opportunity to review application of those regulations to a particular factual context.

*Id.* We are doubtful, therefore, that we have jurisdiction over this claim.

■ But even if judicial review is appropriate, we do not think the new regulations apply retroactively to Dr. Varandani's case, in which all of the pre-suspension proceedings took place more than a year ago. The Department of Health and Human Services has stated that the effective date of the new regulations is May 12, 1987, and has said nothing to indicate that the new rules are to apply retroactively. *See* Dept. of Health & Human Services, Cover Memorandum to Peer Review Organizations, Transmittal No. 15, May, 1987. We therefore see no reason to depart from the usual rule that laws are not retroactive unless they expressly so provide. *See* 2 N. Singer, Sutherland Statutory Construction

§ 41.02, at 340–41; § 41.04, at 348–49 (4th ed. 1986).

We do not think this case is governed by *Thorpe v. Housing Authority*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), which embodies the rule that an appellate court must apply the law in effect at the time of the appeal, not the time the lawsuit was filed. *Thorpe*'s holding that a change in eviction procedures applied retroactively is distinguishable from this case for two reasons. First, the regulation in this case fixes an effective date, whereas the new regulation in *Thorpe* merely stated that it superseded the prior regulation without specifying an effective date. Second, the regulation in *Thorpe* helped cure what otherwise would have been a patently unconstitutional eviction procedure, which provided no notice to the tenant; the new regulation was "essential to remove a serious impediment to the successful protection of constitutional rights." 393 U.S. at 283, 89 S.Ct. at 527. By construing the new regulation as retroactive, the Supreme Court avoided passing on the constitutionality of the earlier, suspect regulation. In this case, by contrast, it is not necessary to construe the new regulation as retroactive to avoid a constitutional problem.

Dr. Varandani also asserts that the change in regulations "reflects Secretary Bowen's own recognition that, at a minimum, the issues relating to PRO sanction procedures in this and other cases warranted more procedural changes." We are unsure whether Doctor Varandani is suggesting that the adoption of new regulations means the old ones were unconstitutional, but in any case we reject such a suggestion. Obviously, the Secretary's adoption of new rules does not in itself mean that the old ones were invalid.

## V.

Finally, Dr. Varandani argues that OIG's extension of the suspension from six months to one year was invalid because it was based on an unwritten policy of imposing sentences of a minimum of one year. Even if this contention is meritorious, and even if it is "collateral" to the merits, it does not justify enjoining the suspension, for at best it means that Dr. Varandani should have been suspended for a maximum of six months rather than a year. Dr. Varandani does not dispute the Secretary's assertion that it will take less than six months to complete administrative review of OIG's extension of the six-month suspension. We conclude, therefore, that it will not prejudice Dr. Varandani to require him to exhaust his administrative remedies as to this issue.

## VI.

Accordingly, we reverse the district court's order enjoining the Secretary from suspending Dr. Varandani, and we remand the case to the district court for further proceedings not inconsistent with this opinion.

REVERSED.