Robert DOYLE, M.D.,
Plaintiff, Appellee,

v.

SECRETARY OF HEALTH AND HU-
MAN SERVICES, Defendant,
Appellant.

Robert DOYLE, M.D.,
Plaintiff, Appellant,

v.

SECRETARY OF HEALTH AND HU-
MAN SERVICES, Defendant,
Appellee.

Robert DOYLE, M.D.,
Plaintiff, Appellee,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES, et al.,
Defendants, Appellees.

Health Care Review, Inc.,
Defendant, Appellant.

Nos. 87–1741, 87–1768.

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 1988.

Decided June 3, 1988.

Michael E. Robinson, Appellate Staff, Civil Div., Dept. of Justice, with whom John F. Cordes, Richard K. Willard, Asst. Atty. Gen., Washington, D.C., and Richard S. Cohen, U.S. Atty., Portland, Me., were on brief, for Secretary of Health and Human Services and Health Care Review, Inc.

Julian L. Sweet with whom Thomas J. Valvano and Berman, Simmons & Goldberg, P.A., Lewiston, Me., were on brief, for Robert Doyle, M.D.

Before BREYER, Circuit Judge, ALDRICH, Senior Circuit Judge, and PETTINE,* Senior District Judge.

BREYER, Circuit Judge.

On December 31, 1986, the Inspector General of the Department of Health and Human Services ("HHS") entered an order forbidding Dr. Robert Doyle, the plaintiff in this case, from receiving reimbursement for treatment of Medicare patients for at least five years. In doing so, the Inspector General accepted a recommendation of a Maine peer review organization ("PRO") that he impose this serious sanction because Dr. Doyle "grossly and flagrantly violated" his obligation to provide medical care "of a quality which meets professionally recognized standards of health care,"

* Of the District of Rhode Island, sitting by designation.

42 U.S.C. §§ 1320c–5(b)(1)(B); 1320c–5(a)(2) (1982), in particular by improperly treating three patients. Dr. Doyle immediately asked a federal district court in Maine to enjoin HHS from carrying out its order.

The district court rejected Dr. Doyle's constitutionally based legal attacks on HHS's statute and procedures, but it agreed with Dr. Doyle that the Maine PRO had failed to follow an HHS regulation governing its choice of recommended sanction. The court issued the injunction, 660 F.Supp. 1484. The Secretary of HHS now appeals. We agree with the Secretary that the district court cannot lawfully issue an injunction at this stage of the agency's proceedings. We therefore vacate the court order.

I

*Background*

A

The statutory and regulatory scheme within which this case arises works as follows:

1. A statute, the Peer Review Improvement Act, 42 U.S.C. §§ 1320c–1 through 13 (1982 & Supp. IV 1986), requires those who provide Medicare-reimbursed services to perform work "of a quality which meets professionally recognized standards of health care." HHS may impose sanctions upon doctors (or other health care providers) who "fail[ ] in a substantial number of cases substantially to comply with," or who "grossly and flagrantly violate[ ]," this obligation. The statute requires the Secretary to monitor doctors through peer review organizations (typically private companies), which themselves use doctors (and nurses) to review doctors' conduct.

2. HHS has enacted regulations specifying procedures that PRO's must follow when they review the quality of Medicare doctors' services. *See* 42 U.S.C. 1320c–3(a)(8) (1982). (These regulations, somewhat amended, are now codified at 42 C.F.R. §§ 1004.1–130 (1987)). If a PRO "identifies" a "substantial violation" of professional health care standards in "a substantial number" of a doctor's "cases," or a "violation" that is "gross and flagrant," it is to notify the doctor in writing. The doctor must have a chance to submit information to the PRO or to meet with it to review its initial finding, or both. If the PRO still believes the doctor has violated Medicare standards, it will submit a report and a sanction recommendation to HHS's Inspector General. The PRO must send a copy of the report and recommendation to the doctor. The doctor may submit additional material to the Inspector General. The Inspector General will then decide whether to apply a sanction. He must notify the doctor of the sanction decision. If he imposes a sanction, it will take effect two weeks after notification. At that time, the Inspector General must also notify members of the medical community (hospitals, medical societies, etc.) and publish notice in the newspaper.

3. The statutes and the regulations provide further administrative remedies for a doctor whom the Inspector General sanctions. The doctor is entitled to a hearing before an Administrative Law Judge (ALJ). The doctor may appeal an adverse ALJ decision to the Secretary's Appeals Council. (At the time of Dr. Doyle's alleged violation, appeals to the ALJ and the Appeals Council were alternative remedies.) And, he can obtain judicial review of the final decision of the Secretary. *See generally* 42 U.S.C. §§ 1320c–1 through 13; 42 C.F.R. §§ 1004.30–130.

B

The relevant facts here are as follows:

1. A private company called Health Care Review, Inc., ("HCRI") is under contract with HHS to run the peer review system in Maine. It employs nurses who examine medical charts of 25 percent to 30 percent of Maine's Medicare patients. If he or she finds a possible problem, the reviewing nurse alerts a doctor, who may refer the matter to a Quality Review Committee (four doctors), which may refer the matter to the Maine Advisory Committee (six doctors), which may make recommendations to the Inspector General.

2. HCRI followed this process in respect to Dr. Doyle. The Quality Review Committee found seven instances in which Dr. Doyle may have committed a sanctionable offense. The Maine Advisory Committee, after hearing from Dr. Doyle, unanimously found there was a "gross and flagrant" violation in three instances, and recommended a five-year exclusion from the Medicare program. After reviewing Dr. Doyle's further submissions, the Inspector General adopted that recommendation.

3. At this point, during the two weeks before the sanction would take effect, Dr. Doyle brought his suit in district court. *See* 42 U.S.C. § 1320c–5(b)(4). After hearing evidence about how the Maine Advisory Committee had conducted its deliberations, the court concluded that the committee had not properly applied the factors listed in a particular HHS regulation. That regulation says:

The PRO's specific recommendation must be based on a consideration of:

(a) The type of the offense involved;

(b) The severity of the offense;

(c) The deterrent value;

(d) The practitioner's or other person's previous sanction record;

(e) The availability of alternative sources of services in the community; and

(f) Any other factors that the PRO considers relevant (for example, the duration of the problem).

42 C.F.R. § 1004.80 (1987). (At the time of Dr. Doyle's sanction, the fifth factor, availability of alternative sources of services in the community, was not part of the list. 42 C.F.R. § 474.6 (1985), amended 1986.) For this reason, the court enjoined "enforcement and publication" of plaintiff's five-year exclusion. The court ordered a new meeting of the Maine Advisory Committee to reconsider its sanction recommendation, this time on the basis of the factors in § 1004.80.

## II

### The Secretary's Appeal

The Secretary argues that the district court could not legally issue an injunction because Dr. Doyle came to court before exhausting his administrative remedies. We believe the Secretary is right. *See, e.g., Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). In the Medicare area, Congress has elevated the ordinary administrative "common law" principle of exhaustion into a statutory requirement. The Medicare statute allows judicial review only after a "final decision by the Secretary." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1320c–5(b)(4). And, the Supreme Court has elaborated upon the meaning of this statutory language. The "finality" requirement

consists of two elements, ... one of which [the requirement that the claim be presented to the Sécretary,] is purely "jurisdictional" in the sense that it cannot be waived by the Secretary in a particular case. The [other,] waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted.

*Bowen v. City of New York*, 476 U.S. 467, 483, 106 S.Ct. 2022, 3031, 90 L.Ed.2d 462 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1976)).

In this instance, Dr. Doyle's claim has "been presented" to the Secretary; indeed one of the Secretary's administrators, the Inspector General, has imposed the very sanction about which Dr. Doyle complains. Dr. Doyle, however, has not "exhausted" the Department's administrative appeals; and, there is no "final" decision of the Secretary because the Secretary has not "waived" exhaustion.

Dr. Doyle argues that his claim fits within a narrow exception to the exhaustion rule, an exception where courts have found the agency *must waive* exhaustion. That exception applies to an "entirely collateral" matter where the agency has deprived an individual of something important and "full relief cannot be obtained" later from the agency. *City of New York, id.*, (quoting *Mathews*, 424 U.S. at 331, 96 S.Ct. at 900). In our view, however, Dr. Doyle's case does not fall within this exception.

To understand why, one must first understand the policy basis of an exhaustion rule:

> [Exhaustion] allows the agency to develop a factual record, to apply its expertise to a problem, to exercise its discretion, and to correct its own mistakes, all before a court will intervene. Insofar as specialized administrative understanding is important, the doctrine thereby promotes accurate results, not only at the agency level, but also by allowing more informed judicial review. By limiting judicial interruption of agency proceedings, the doctrine can encourage expeditious decision making. Insofar as Congress has provided that an agency will decide a matter in the first instance, to apply the doctrine normally furthers specific Congressional intent. And, as a general matter, the doctrine promotes a sensible division of tasks between the agency and the court: litigants are discouraged from weakening the position of the agency by flouting its processes, while court resources are reserved for dealing primarily with those matters which could not be resolved administratively. Thus, the doctrine serves the interests of accuracy, efficiency, agency autonomy and judicial economy.

*Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 774 (1st Cir.1981) (citations omitted), *quoted in Wilson v. Secretary of Health and Human Services*, 671 F.2d 673, 677–78 (1st Cir.1982). *See McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

■ Given these policy principles, one can understand why, for example, when a plaintiff attacks the lawfulness of an important "systemwide" agency policy (say, a constitutional challenge to a policy disqualifying a large class of potential Social Security recipients), the Supreme Court has held that the agency *must* waive its exhaustion requirements. In that sort of case exhaustion serves little purpose; the agency's policy is well-established and unlikely to change; agency expertise is not particularly likely to help the court; and, at the same time, to insist upon exhaustion of agency procedures might well physically harm a plaintiff needing benefits. *City of New York*, 476 U.S. at 482–87, 106 S.Ct. at 2031–33. Where the plaintiff's claims, however, raise issues where the agency's expertise may be helpful, or attack policies to which the agency is less firmly attached, or seem more closely confined to the facts of a particular case, exhaustion is required. *Compare Eldridge*, 424 U.S. at 319, 326–332, 96 S.Ct. at 893, 898–901 (constitutional challenge of Social Security Administration (SSA) policy of terminating disability benefits before granting particular kind of evidentiary hearing is "collateral" issue not subject to § 405(g)'s exhaustion requirement) *with Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (exhaustion required under § 405(g) for challenge to alleged "irrebuttable presumption" contained in Social Security Act's definitions of "widow" and "child"); *Varandani v. Bowen*, 824 F.2d 307 (4th Cir.1987); *Kwoun v. Schweicker*, 528 F.Supp. 1004 (E.D.Mo.1981); *see Wilson*, 671 F.2d at 673 (Social Security recipient's claim that SSA misapplied Social Security Act in overpayment recovery action subject to § 405(g)'s exhaustion requirement).

■ The case before us is one that falls within the rule, not the exception. Dr. Doyle's case involves one plaintiff, not a class. In Dr. Doyle's case, agency expertise can help the court evaluate whether or not the Advisory Committee recommendation was "based on a consideration of" the relevant factors, because the agency (HHS) is likely better to understand (1) how a PRO does, or should, go about considering those factors, (2) how HHS, which wrote the regulation, interprets the word "consideration," *see United States v. Franchi-Forlando*, 838 F.2d 585, 588 (1st Cir.1988) ("it is primarily up to an agency to interpret its own regulations. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980)"), and (3) whether, given the statute, rules, and regulations, any PRO deviation from the regulation's norm made a significant difference to Dr. Doyle. There is no reason here to think the agency has a closed mind on these matters. It is not wedded to

a particular long-standing policy that is under attack. *Cf. City of New York,* 476 U.S. at 485, 106 S.Ct. at 3032. If the PRO has made a mistake in applying the agency's rules, the agency will likely correct it. That is to say, unlike *City of New York* or *Eldridge,* here agency expertise is highly relevant and the agency should be given a chance to correct its own mistakes (if any). *Wilson,* 671 F.2d at 677–78 (citing *McKart,* 395 U.S. at 185, 89 S.Ct. at 1657 and *Ezratty,* 648 F.2d at 774). Even if we assume for argument's sake that delay would harm Dr. Doyle (an uncertain matter), his potential injury cannot overcome those factors counseling "exhaustion," particularly in light of the potential and countervailing harm to patients that might arise here or in other cases through disregard of the agency's own remedial scheme. *Cf. Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (government employee's imminent discharge does not qualify as "irreparable harm" sufficient to merit injunction to reinstate pending further review); *Salfi,* 422 U.S. at 765, 95 S.Ct. at 2467 ("the doctrine of administrative exhaustion should be applied with a regard for the particular administrative scheme at issue"); *Varandani, supra; Kwoun, supra; Wilson, supra.*

### III

### *Dr. Doyle's Appeal*

Dr. Doyle cross-appeals from the district court's rejection of his claims that the Inspector General's decision violated the Constitution. Since all parties wish us to hear the merits of these arguments, and the Secretary, at oral argument, expressly waived any exhaustion requirement, we shall do so. And, we conclude the district court was correct.

■ 1. Dr. Doyle argues that the relevant statute's terms, punishing those who "grossly and flagrantly violated" the "obligation" to "assure services ... of a quality which meets professionally recognized standards of health care," 42 U.S.C. § 1320c–5(a)(2), are so vague that the Constitution's Due Process Clause prohibits Congress from using the statute to deprive

him of part of his income. U.S. Const. Amend. V; *Braslett v. Cota,* 761 F.2d 827, 838–47 (1st Cir.1985); *Gannett Satellite Information Network, Inc. v. Town of Norwood,* 579 F.Supp. 108 (D.Mass.1984). Dr. Doyle says that the statutes (and regulations) do not "provide a constitutionally adequate warning to those whose activities are governed." *Precious Metals Associates, Inc. v. Commodity Futures Trading Commission,* 620 F.2d 900, 906 (1st Cir. 1980) (quoting *Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1336 (6th Cir.1978)).

Other courts, holding this provision constitutional, have done so in part because "[t]he definition of adequate medical care cannot be boiled down to a precise mathematical formula; it must be grounded in what, from time to time, other health professionals consider to be acceptable standards of medical care." *Varandani,* 824 F.2d at 312. To the medical profession, which will administer this standard, it has reasonably clear meaning. *Id. See Precious Metals,* 620 F.2d at 907–08 (use of technical language in commodity market regulations is not void for vagueness because "the Act exposes to penalties only highly specialized members of a professional class who, for purposes of their livelihood, know thoroughly" what these technical terms mean). As the Fourth Circuit held in *Varandani,* there is no showing that, in the medical context, "men of common intelligence must necessarily guess" at the meaning of the terms of this statute, *Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), nor that because of the terms' vagueness, "no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). Consequently, for reasons set forth at greater length in *Varandani, supra,* the statute is not unconstitutionally vague.

■ 2. Dr. Doyle argues that the procedure that HHS uses to decide whether, and how, to institute a sanction is constitutionally inadequate. In particular, he says that the Constitution entitles him to a full evi-

dentiary hearing before the Inspector General imposes a sanction.

Even if we assume, however, for the sake of argument, that Dr. Doyle's injury amounts to a deprivation of "liberty" or "property," within the terms of the Fifth Amendment, *see Paul v. Davis,* 424 U.S. 693, 708–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *Koerpel v. Heckler,* 797 F.2d 858, 865–66 (10th Cir.1986), we must still reject his argument, for HHS provides Dr. Doyle with all of the "process" that is constitutionally "due." The Agency's procedures require the PRO to give him notice and an opportunity to meet with it before it makes a recommendation. 42 C.F.R. § 1004.50. The PRO must inform him of its recommendation and provide him with a chance to submit materials to the Inspector General. 42 C.F.R. § 1004.60. After the Inspector General acts, the doctor is entitled to a full evidentiary hearing before an ALJ, and to appellate agency review. 42 C.F.R. § 1004.130(a). He is also entitled to review of a final agency decision in federal court. 42 U.S.C. §§ 1320c–5(b)(4); 28 U.C.C. § 405(g). While a full, formal, *courtroom-type* evidentiary hearing *prior* to the Inspector General's imposition of a sanction might offer still more protection against one kind of agency mistake (wrongly sanctioning a doctor), it would offer Medicare patients less protection against another equally important kind of mistake (failing to warn patients against a doctor whose services are seriously deficient). Under the Constitution, the agency should, and does, have leeway to balance these two risks. And, the procedural result of that balancing here is reasonable. *See, e.g., Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed. 2d 494 (1985) (security guard has right to "essential elements of due process" before termination; these consist of notice and an opportunity to respond, but no right to adversarial hearing); *Mathews,* 424 U.S. at 343, 96 S.Ct. at 907 ("something less" than full evidentiary hearing is sufficient due process prior to termination of Social Se-

curity disability benefits); *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) ("[t]he formality and procedural requisites for the hearing [required under the Due Process Clause] can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," (footnote omitted)). We join the other circuits that unanimously have reached the same conclusion. *Cassim v. Bowen,* 824 F.2d 791, 796–99 (9th Cir.1987); *Varandani,* 824 F.2d at 310–11; *Koerpel,* 797 F.2d at 868–69; *Ritter v. Cohen,* 797 F.2d 119, 122–24 (3d Cir.1986).

3. Dr. Doyle claims that the PRO's recommendation deprived him of "property" or "liberty" without due process of law because the PRO was "biased" against him. Insofar as this argument rests upon the PRO's dual role as prosecutor and judge, the Supreme Court has explicitly rejected it. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Insofar as it rests on his claim that the Committee decided against him because it was "under pressure" to find a "victim" and impose a sanction, the district court rejected it as a matter of fact. Similarly, the court found that the Committee's recommendation did not rest on any personal bias against Dr. Doyle growing out of his attacks on the Committee. The court discusses the evidence in its opinion. We have examined the record and cannot say the court's findings are "clearly erroneous." Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Brophy v. Lavigne,* 801 F.2d 521, 524 (1st Cir.1986).

*The part of the judgment of the district court upholding the constitutionality of the Secretary's sanction decision is affirmed. The part of the judgment of the district court declaring the Secretary's sanction decision an invalid violation of agency regulations and enjoining further agency action is reversed.*