Nermin D. LAVAPIES, M.D., Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of Health and Human Services, et al., Defendants.

No. C–2–88–0090.

United States District Court, S.D. Ohio, E.D.

May 24, 1988.

Robert M. Gippin, Akron, Ohio, for plaintiff.

Robert E. Hanson, Chicago, Ill., Joe Kane, U.S. Atty., Columbus, Ohio, for defendants.

## MEMORANDUM, OPINION AND ORDER

GRAHAM, District Judge.

This matter is before the Court on the plaintiff's application for a preliminary injunction and defendants' motion to dismiss. An evidentiary hearing was held on plaintiff's application for a preliminary injunction and the parties have extensively briefed the issues now before the Court.

Plaintiff, Nermin D. Lavapies, is a physician practicing in Belmont County, Ohio and engaged in family practice. On January 11, 1988, Dr. Lavapies was notified that she would be excluded from participation in the Title XVIII (Medicare) Program for a period of one year. In this action, she seeks a preliminary and permanent injunction enjoining the defendants from excluding her from the medicare program, denying her medicare payments and from giving notice of her exclusion. Defendants move to dismiss on the grounds that the Court lacks subject matter jurisdiction for the reason that the plaintiff has failed to exhaust her administrative remedies under the Social Security Act.

### A. *Administrative Procedures*

Under the Social Security Act, health care practitioners have an obligation to assure that services provided to beneficiaries (1) will be provided economically and only when and, to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality. 42 U.S.C. § 1320c–5(a).

In order to ensure that health care practitioners meet the obligations of 42 U.S.C. § 1320c–5(a), Congress has enacted a system of medical peer review. Peer review is conducted by utilization and quality control

peer review organizations (PRO) which contract with the Secretary of Health and Human Services to service a particular geographic area. 42 U.S.C. § 1320c-2. A PRO is an entity which is either "composed of a substantial number of the licensed doctors of medicine and osteopathy engaged in the practice of medicine or surgery in the area" or "has available to it ... the services of a sufficient number of licensed doctors of medicine or surgery in such area ..." 42 U.S.C. § 1320c-1(1)(A). Each contract with a PRO is for an initial term of two years and is renewable on a biennial basis thereafter. 42 U.S.C. § 1320c-2(c)(3).

The PRO for a particular area has responsibility for reviewing the professional activities of physicians and other health care practitioners relating to their provision of services to Medicare beneficiaries. 42 U.S.C. § 1320c-3(a)(1). The PRO determines whether items and services rendered were reasonably and medically necessary; whether the quality of such services meets professionally recognized standards of health care; and, where such services and items were to be provided in a hospital on an inpatient basis, whether the services and items could be effectively provided more economically on an out-patient basis or in an inpatient health care facility of a different type. 42 U.S.C. § 1320c-3(a)(1).

If the PRO determines that a health care practitioner has violated his or her statutory obligations, the PRO must determine whether the violation was a gross and flagrant violation. 42 C.F.R. § 1004.40. If the PRO determines that the violation is a gross and flagrant one, the PRO must give the practitioner written notice setting out this determination, the basis for it, and the sanction that will be recommended. 42 C.F.R. §§ 1004.40 and 1004.50. The notice must also provide that the practitioner has a right to submit additional information or a request for a meeting with the PRO within thirty days. A copy of the material used by the PRO in the preliminary determination is to be provided to the practitioner. 42 C.F.R. § 1004.50.

Following review of the information provided by the practitioner in writing or at the meeting, the PRO makes a determination whether the practitioner has violated his or her obligation. 42 C.F.R. § 1004.50. If the PRO determines that there has been a gross and flagrant violation, the PRO must submit a report and recommendation of sanction to the Office of the Inspector General (OIG) of the Department of Health and Human Services (HHS). 42 C.F.R. § 1004.70. In recommending a sanction, the PRO should consider the type of offense, its severity, the deterrent value of the sanction, and the availability of alternative health care services in the community. 42 C.F.R. § 1004.80. A copy of the PRO report sent to the OIG must also be sent to the affected practitioner along with a notice informing him or her that the recommendation has been submitted and that he or she has 30 days to submit any additional material to the OIG. 42 C.F.R. § 1004.60(b)(1), (2).

Once the OIG receives the PRO's report and recommendation, the OIG must review the report and recommendation to determine whether (1) the PRO is following its procedure; (2) a violation has occurred; and (3) the practitioner has demonstrated an unwillingness or lack of ability to substantially comply with his or her obligation. 42 C.F.R. § 1004.90. If the OIG agrees that a practitioner has violated his or her obligations, the OIG must decide upon an appropriate sanction. In deciding upon a sanction, the OIG considers (1) the PRO's recommendation; (2) the type of offense; (3) the severity of the offense; (4) the previous sanction record of the practitioner, (5) the availability of alternative health care sources in the community; (6) any prior problems Medicare has had with the practitioner; (7) whether the practitioner is unable or unwilling to comply substantially with the obligations; and (8) any other relevant matters. 42 C.F.R. § 1004.90(d).

Once the OIG decides on a sanction, the OIG must give notice to the practitioner of the type of sanction to be imposed. 42 C.F.R. § 1004.100. The sanction is effective 15 days from receipt of the notice. 42 C.F.R. § 1004.100(b). The OIG notifies the

public of the sanction by a notice in a newspaper of general circulation. 42 C.F.R. § 1004.100(d).

If a practitioner is dissatisfied with the OIG's determination and sanction, the practitioner may request an evidentiary hearing before an administrative law judge (ALJ). 42 C.F.R. § 1004.130(a)(1). At this hearing, the practitioner is entitled to call witnesses under oath, to cross-examine witnesses, and to submit documents, briefs and oral argument. 42 C.F.R. §§ 498.61–498.63. The ALJ's decision after this hearing is appealable to the Appeals Council. 42 C.F.R. § 498.80. The Appeals Council's decision is the final agency action. If the practitioner is dissatisfied with the Secretary's final decision, the practitioner may appeal the decision to the district court. 42 U.S.C. §§ 1320c–5(b)(4), 405(g).

### B. *Statement of Facts*

The PRO for Ohio is Peer Review Systems, Inc. ("PRS"). On March 18, 1987, Dr. Lavapies received notice from PRS that in five cases, she had violated her obligation under § 1156 of the Social Security Act to provide medical services which meets professionally recognized standards. Two of the cases were alleged to be gross and flagrant violations, the remainder were alleged to be substantial. The letter enclosed copies of the medical records used by PRS in arriving at its determination and also enclosed a case synopsis identifying each case reviewed and the issues raised by PRS. Dr. Lavapies was invited to submit, within thirty days, additional information which she felt would modify PRS's position. On April 8, 1987, counsel for Dr. Lavapies responded to this letter and requested a meeting with PRS's physicians. Such a meeting was held on June 4, 1987. At that time, Dr. Lavapies, accompanied by counsel, met with six of PRS's physicians. She was questioned by the PRS physicians and was given the opportunity to present information and argument on her own behalf.

Following the June 4, 1987 meeting, the Board of Trustees of PRS determined that Dr. Lavapies had grossly and flagrantly violated her statutory obligations by providing substandard management of a newly admitted, deteriorating patient, and by failing to appropriately assess and address this patient's critical and life-threatening symptoms reported to her by the hospital nursing staff. The patient died.

By letter dated September 11, 1987, PRS notified Dr. Lavapies that it had determined that she had failed to comply substantially with her § 1156 obligations, that one violation was gross and flagrant, and two were substantial. She was notified that PRS had submitted a recommendation to the Department of Health and Human Services to exclude her from the Medicare program for a period of two years. She was informed that she could submit to the OIG, within thirty days, any additional material which might affect the exclusion recommendation. Defendant asserts that Dr. Lavapies availed herself of this opportunity on October 6, 1987, when her counsel submitted a lengthy letter with attachments to the OIG, however, the Court is unable to find such a letter in the record of this case.

By letter dated January 11, 1988, the OIG informed Dr. Lavapies that she was excluded from the program for a period of one year. In this notification, the OIG recited the following findings:

> After a careful review of all the evidence of record and acting on the authority delegated to me by the Inspector General of the Department of Health and Human Services, I have determined I agree with the PRO that in case number 105–296 you grossly and flagrantly violated your obligation to provide care that meets professionally recognized standards of quality.
>
> I have also determined that you have demonstrated an inability and unwillingness substantially to comply with the obligations imposed on you by section 1156(a) of the Social Security Act....

\* \* \* \* \* \*

### C. *Subject Matter Jurisdiction*

As a matter of first importance, this Court must determine if its own jurisdiction has been properly invoked. The juris-

dictional issue arises out of the specific provisions of 42 U.S.C. § 1320c–5(b)(4):

(4) Any practitioner or person furnishing services described in paragraph (1) who is dissatisfied with a determination made by the Secretary under this subsection shall be entitled to reasonable notice and opportunity for a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

Section 405(g) authorizes judicial review after a *final* decision of the Secretary made after a hearing to which the claimant was a party. At this juncture, no final decision has been issued by the Secretary and Dr. Lavapies cannot satisfy the requirements of § 405(g). Section 405(h) provides as follows:

The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

■ Dr. Lavapies acknowledges that she has not exhausted her administrative remedies and argues that the requirement of exhaustion should be waived under the Rule of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In *Mathews,* the court held that in some cases "a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inap-

propriate." *Id.* 424 U.S. at 330, 96 S.Ct. at 900. The court held that the exhaustion requirement could be excused if three requirements are met: (1) if exhaustion would be futile, i.e., the purpose of exhaustion would not be served, (2) if irreparable harm would ensue pending exhaustion; and, (3) if a colorable claim which is collateral to the substantive claim of entitlement is raised. The Court did not specifically define "colorable," presumably therefore it should be given its plain and ordinary meaning which, in this context would be "seemingly valid," or "having the appearance of right," synonymous with "plausible." *See* Websters Third New International Dictionary.[1]

In *Mathews,* the claim was a constitutional one, but in the subsequent case of *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986), the court applied the *Mathews* rule to a claim that the plaintiffs "were denied the fair and neutral procedure required by the statute and regulations." *Id.* at 487, 106 S.Ct. at 2033. This Court concludes therefore that a colorable collateral claim need not be a constitutional claim to satisfy the *Mathews* rule.

In order to determine whether or not this Court has jurisdiction, the *Mathews* test must be applied to each of the plaintiff's claims.

Eight of the plaintiff's claims are succinctly enumerated in the summary of her supplemental memorandum in support of motion for preliminary injunction (Doc. 11) pages 1 and 2 as follows:

(b) Plaintiff received no pre-exclusion hearing of any kind on the determination that she was unwilling or unable to conform to professional standards.

---

1. In *Boettcher v. Secretary of Health and Human Services,* 759 F.2d 719 (9th Cir.1985), the court said:

Courts have not expressly defined what a "colorable" claim is. One court has held that claims were reviewable because they were "not without some merit." *Jensen v. Schweiker,* 709 F.2d 1227, 1230 n. 2 (8th Cir.1983). Another court has indicated that a putative

constitutional claim should be dismissed if it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial or frivolous." *Holloway v. Schweiker,* 724 F.2d 1102 (4th Cir.), *cert. denied,* 467 U.S. 1217, 104 S.Ct. 2664, 81 L.Ed.2d 369 (1984), *quoting, Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

(c) A full evidentiary hearing should be required before the exclusion of a physician from the Medicare program.

(d) The statutory and regulatory scheme for peer review creates and permits biased decision-making, thereby depriving Plaintiff of due process.

(e) Plaintiff was excluded under a standard set forth in a procedural manual not adopted under the Administrative Procedures Act.

(f) The standard under which Plaintiff was excluded is unconstitutionally vague.

(g) Plaintiff's exclusion was improperly based on a standard of care inapplicable to rural Belmont County, Ohio.

(h) The procedures followed by the PRO do not demonstrate compliance with the regulations adopted by the Department of Health and Human Services.

(i) The Government has failed to implement the terms of its agreement in *AMA v. Bowen,* of which Plaintiff is a third-party beneficiary.

■ Many of plaintiff's claims are cast in terms of alleged violations of her due process rights. Accordingly, a threshold question is whether or not plaintiff has a constitutionally protected right in her continued status as a provider of medical services under the Medicare program. While other courts have addressed this question, the law in this area is unclear. The issue breaks down into two parts: does the suspension of provider status under the Medicare program implicate either a property interest or a liberty interest protected under the Fifth Amendment? *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

In *Ritter v. Cohen,* 797 F.2d 119 (3d Cir.1986), the United States Court of Appeals for the Third Circuit refused to dismiss a case similar to the present one holding that the plaintiff was entitled to try to prove that the regulations governing suspension from the program created a reasonable understanding that a provider would not be terminated without cause, one of the hallmarks of a property interest. In *Koerpel v. Heckler,* 797 F.2d 858 (10th Cir.1986), the Tenth Circuit Court of Appeals held that the suspension of medicare provider status did not implicate a property interest but did implicate a liberty interest. That court held that while reputational damage alone is not sufficient to support a claim of liberty deprivation, its linkage to a substantial financial interest in continued medicare reimbursement was sufficient to present a colorable allegation of deprivation of a liberty interest. This Court concludes that Dr. Lavapies' claims likewise present colorable allegations of deprivations of property and liberty interests thus vesting this Court with jurisdiction to entertain her due process claims. In reaching this result, the Court expressly reserves final judgment on the issue of whether or not suspension of a physician-provider's status under the Medicare program does implicate property or liberty interests. These are questions of considerable importance which should be decided only on the basis of an adequate record.

In *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709, the Supreme Court said:

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Here, the plaintiff will undoubtedly rely upon the statutes and regulations which govern her status of a Medicare provider and in particular those which control her suspension from the program. Plaintiff will be permitted to attempt to prove that these provisions create more than a unilateral expectation.

At this juncture, the Court would note the increasing importance of Medicare provider status to this country's physicians. The day may well come, if it has not already, that the ability of many of the country's physicians to continue to practice their profession is dependent upon their ability to be reimbursed for services rendered to Medicare patients. The evidence introduced at the preliminary hearing in

this matter disclosed at least part of the picture of the importance of a physician's status as a Medicare provider and the ability not only to be reimbursed for services provided to Medicare patients but also the ability to participate in other important professional activities. For instance, the evidence showed that suspensions of medicare status will have an impact on plaintiff's ability to admit patients to the local hospital and to participate in health maintenance organizations, and she will not be permitted to continue as the medical director of an alcohol treatment program administered by the Martin's Ferry Health District.

Plaintiff is also entitled to attempt to prove that the suspension of her Medicare provider status implicates a liberty interest. Some courts have held that reputational damage alone is insufficient to support a claim of liberty deprivation. *See McGhee v. Draper,* 639 F.2d 639, 643 (10th Cir.1981); *Lake Michigan College Federation of Teachers v. Lake Michigan Community College,* 518 F.2d 1091 (6th Cir. 1975). Here, the government intends to publish notice of plaintiff's suspension in a newspaper of general circulation in the community in which she lives and practices medicine. Presumably, that notice will include a statement of the grounds for this suspension, namely that the office of the Inspector General of the Department of Health and Human Services has determined that she was guilty of a gross and flagrant violation of her duty to provide medical care which meets professionally accepted standards and that she has demonstrated an unwillingness and an inability to substantially comply with her responsibilities to supply such medical care. The fact of publication plus the potential impact upon plaintiff's ability to practice her profession, including potential impact in areas other than treatment of Medicare patients, may rise to the level of implicating a liberty interest.

Plaintiff has asserted a colorable claim that defendants actions implicate liberty and property interests within the protection of the Fifth Amendment.

By letter dated September 11, 1987, Dr. Lavapies was notified by PRS that a recommendation had been submitted to the OIG that she be excluded from participation in the program for a period of two years. Under 42 U.S.C. § 1320c–5(b)(1), exclusion from the program is predicated on a finding that a practitioner has grossly and flagrantly violated an obligation in one or more instances and that the practitioner has demonstrated an unwillingness or lack of ability substantially to comply with such obligations. The first determination was made by the OIG based upon PRS's determinations made after the fact-finding process described above. The second determination was made by the OIG without a specific finding or recommendation by PRS but after notice to the plaintiff that the OIG was considering the sanction of suspension.

Plaintiff was given the opportunity to submit additional information to the OIG and she was aware that suspension could occur only in the event of a finding that she had demonstrated an inability or unwillingness to conform to the obligation to provide medical care which meets professionally recognized standards.

The material which accompanied the PRO's letter of September 11, 1987 is not before the Court, neither is the plaintiff's submission to the OIG. Thus, it is impossible for the Court to determine just what evidence was relied upon by the OIG in making its determination that Dr. Lavapies had demonstrated an unwillingness or lack of ability to substantially comply with her obligations under § 1156. Nor is it possible for the Court to determine whether or not Dr. Lavapies was notified of the basis for the allegation that she was unwilling or unable to substantially comply with her obligations under § 1156. The OIG stated that its determination of plaintiff's inability to comply was based on the following evidence:

> Your inability has been demonstrated by the history of quality of care problems that the PRO has identified. Your unwillingness and inability are demonstrated by your failure to follow the Corrective Action Plan (CAP) agreed to by you

and the PRO on February 10, 1986. This CAP required that you evaluate newly admitted patients in person prior to issuing orders for care. Subsequently, however, on March 28, 1986, in Case No. 105–296, you did not see the patient for 17 hours and issued orders for the patient's care without a personal evaluation.

The Court is unable to determine what history of quality care problems was identified by the PRO, and the Court is unable to determine whether or not Dr. Lavapies was made aware of the evidence of this alleged history prior to her suspension. The Court cannot determine whether or not the plaintiff was notified that the OIG intended to rely on her alleged failure to follow a previous corrective action plan in determining that she was unwilling or unable to substantially comply with her obligations under § 1156.

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985), the Court summarized the essential requirements of due process in the context of a pre-termination hearing for a tenured public employee as follows:

> The essential requirements of due process, . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. (citations omitted) The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

In *Brock v. Roadway Express, Inc.,* — U.S. ——, 107 S.Ct. 1740, 1749, 95 L.Ed.2d 239 (1987), the Court held:

> [T]he constitutional requirement of a meaningful opportunity to respond before a temporary deprivation may take effect entails, at a minimum, the right to be informed not only of the nature of the charges but also of the substance of the relevant supporting evidence.

The Supreme Court has established similar pre-suspension due process requirements for school students facing short term suspensions of ten days or less. In *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), the Court said:

> [S]tudents facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

In *Newsome v. Batavia Local School District*, 842 F.2d 920 (6th Cir.1988.) The court found that the local school board denied a student due process when it failed to apprise him of a significant item of evidence which the board considered in his pre-suspension hearing.

 Due process in the context of a pre-termination or pre-suspension hearing requires three things: (1) notice of the nature of the charge; (2) notice of the substance of the relevant supporting evidence; and (3) an opportunity for the affected party to present his or her side of the story. Focusing on the issue of unwillingness or inability to provide services which meet professionally recognized standards of health care, Dr. Lavapies was notified of the nature of the charge and she was given an opportunity to present her side of the story, but she claims that she was not advised of the evidence offered against her. The present record of this case does not disclose that she was so informed. Of course, if she was not informed of the evidence against her, this would also impact upon her right to present her side of the story. The Court finds that the plaintiff has asserted a colorable constitutional claim that defendants' pre-suspension hearing procedures violated her due process rights.

 Plaintiff next contends that she was entitled to a full evidentiary hearing before exclusion from the Medicare program.

Courts which have considered this issue have uniformly held that a Medicare provider is not entitled to a full evidentiary hearing prior to suspension from the program process. *See Varandani v. Bowen,* 824 F.2d 307 (4th Cir.1987); *Cassim v. Bowen,* 824 F.2d 791 (9th Cir.1987); *Ritter v. Cohen,* 797 F.2d 119 (3d Cir.1986); *Koerpel v. Heckler,* 797 F.2d 858 (10th Cir.1986); *Papendick v. Bowen,* 658 F.Supp. 1425 (W.D.Wis.1987); *County of San Diego v. Bowen,* 631 F.Supp. 947 (S.D.Cal.1986); *Kwoun v. Schweiker,* 528 F.Supp. 1004 (E.D.Mo.1981); *Lemlich v. Schweiker,* 679 F.2d 873 Paragraph 31, 629 CCH Medicare and Medicaid Guide, (2d Cir.1981); *Toussaint v. Heckler,* Civil Action No. 83–1720–3 (D.S.C. Sept. 13, 1983); *Roller v. Department of Health and Human Services,* Civil R–86–338 BRT (D.Nev. August 15, 1986) [available on WESTLAW 1986 WL 20820].

In each of the cases cited, the courts have balanced the competing interests in accordance with the principles set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) and have concluded that due process does not require a full-blown evidentiary hearing prior to termination of provider status under the medicare system. The Court agrees and further concludes that the result is clear enough to say that plaintiff's claim that she is entitled to a full evidentiary hearing prior to suspension is not colorable.

■ Plaintiff next claims that the statutory and regulatory scheme for peer review creates and permits biased decision-making, thus depriving plaintiff of due process. She contends that because the Social Security Act does not limit the compensation of PRO physicians "to the amount of expenses reasonably and necessarily incurred, as determined by the Secretary" as did the former Act, that the reviewing physicians have a potential direct financial stake in their decisions to exclude. Plaintiff also suggests that the reviewing physicians may have a competitive incentive to remove other physicians from the program. Finally, plaintiff argues that the Department may measure a PRO's performance against a targeted or projected number of sanction recommendations. Plaintiff's claim that the PRO was biased is not collateral and she should be required to exhaust her administrative remedies before pursuing this claim in court. In *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975), the Court stated:

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*See Papendick v. Bowen,* 658 F.2d at 1432–1433; *Lemlich v. Schweiker,* 679 F.2d 873 629 CCH Medicare and Medicaid Guide. The claim of bias is not collateral but is instead intertwined with plaintiff's claims that PRS and the OIG erred in their decisions to exclude her from the program. *See Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). The Court also finds that this claim is not colorable. The allegation of bias based upon an incentive to remove physicians from the program for competitive reasons lacks substance in view of the fact that none of the reviewing physicians in this case could reasonably be viewed as competitors of the plaintiff. Most were physicians practicing in large cities hundreds of miles from the small rural community in which the plaintiff practices, and none were engaged in plaintiff's specialty of family practice.

This Court agrees with the conclusions reached by the court in *Richards v. Emanuel County Hospital Authority,* 603 F.Supp. 81 (S.D.Ga.1984) and finds them equally applicable to the system of peer review involved in the present case:

> Arguably, the medical staff of any hospital has a pecuniary interest in the number of doctors on the staff. Bad motive, however, is not to be presumed. Peer review of doctors is an established procedure for determining qualifications for staff privileges. The doctors of a hospi-

tal's medical staff and the hospital's governing authority are best able to establish the criteria and methodology for review of a doctor's competence to serve on the staff. (citations omitted) I am satisfied that peer review by members of the medical staff of a fellow doctor's qualifications to continue on the medical staff does not automatically violate the requirements of due process, and I am unwilling to presume that the possibility of financial gain would motivate the individuals of the staff to act in an arbitrary and capricious manner.

*Id.* at 85.

The suggestion of bias on the grounds that the Secretary requires or expects a certain number of sanctions is based solely on the language of 42 U.S.C. § 1320c–2(c)(7) which states:

Each contract with an organization under this section shall provide that—

. . . . .

(7) the Secretary shall include in the contract negotiated objectives against which the organization's performance will be judged, and negotiated specifications for use of regional norms, or modifications thereof based on natural norms, for the performing review functions under the contract; ...

Nowhere is it stated that the negotiated objectives against which the PRO's performance would be judged includes the number of sanctions imposed on providers. Plaintiff's argument that such considerations might be included in the contract is pure speculation. PRS's vice president of finance testified that an expected number of sanctions was never discussed with HHS. The claim that the PRO physicians have a direct financial stake in their decisions because their compensation is not expressly limited to the amount of their expenses is a *non sequitur.* Most adjudicators public and private are paid for their time and effort.

PRS is a non-profit corporation. Its vice president of medical affairs, Dr. William Smith, a practicing physician, receives $55 per hour for his services. Members of its physicians review panels are paid $60 per hour for the first hour with a one hundred dollar maximum plus $.20 per mile for travel. These physicians are paid at the rate of $50 per hour for file review. Plaintiff does not allege that the compensation of PRS physicians is in any way affected by the outcome of a particular case. The Court concludes that the claim that the PRO is inherently biased is not a colorable claim.

■ Plaintiff next contends that she was excluded from the Medicare program under a standard set forth in a procedural manual containing legislative rules not adopted pursuant to the notice and comment rulemaking procedures of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. The manual in question is known as the Peer Review Organizational Manual. Transmittal No. 6 of this manual governs sanction procedures, pursuant to § 1156 of the Social Security Act. In her brief, plaintiff challenges only one provision of the manual; accordingly, it is not necessary to discuss all of the provisions relating to sanctions. The particular provision in question is the definition of gross and flagrant violation set forth at § 6010 of the manual as follows:

A "gross and flagrant" [sic] is a violation of an obligation which has occurred in one or more instances and which presents an imminent danger to the health, safety or well-being of a Medicare beneficiary or unnecessarily places the beneficiary in high-risk situations such as risk of substantial and permanent harm.

This definition tracks the definition of gross and flagrant violation contained in 42 C.F.R. § 1004.1(b). Plaintiff does not suggest that there was any defect in the rulemaking process with respect to that definition. The only difference between the definition of gross and flagrant violation contained in the Code of Federal Regulations and the definition contained in the Peer Review Organizational Manual is the final phrase of the manual's definition: "such as risk of substantial and permanent harm." This phrase does not appear in § 1004.1(b). Plaintiff argues that the meaning of this additional phrase "is critical and at best uncertain" and that "it goes far beyond

interpretation and adds concepts which should properly have been considered only in connection with the formal adoption of the definition in the rule-making process."

The Court concludes that the phrase in question is not a legislative rule subject to notice and comment rule-making procedures, but it is merely a restatement or clarification of the existing regulation. It neither creates nor denies any rights and does not impose any obligations which do not already exist in the regulation. It merely reiterates existing duties and is an effort to explain and clarify the existing regulation by providing an example. The APA expressly exempts interpretative rules from the notice and comment rule-making procedures ordinarily required. 5 U.S.C. § 553(b)(A). Interpretive rules "are statements as to what the Administrative Officer thinks the statute or regulation means." *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952). An interpretive rule only " 'reminds' affected parties of existing duties." *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C. Cir.1984), *quoting, Citizens to Save Spencer County v. United States EPA,* 600 F.2d 844 (D.C.Cir.1979). While this claim is collateral, under the rule of *Mathews v. Eldridge,* it is not colorable.

Plaintiff next argues that the standard under which she was excluded is unconstitutionally vague. She argues that the definition of "gross and flagrant violation" is uncertain and unconstitutionally vague. The Fourth Circuit Court of Appeals considered the same argument and found that it did not provide a colorable basis on which to ground jurisdiction. *See Varandani v. Bowen,* 824 F.2d 307 (4th Cir.1987). This Court agrees and will adopt the reasoning of *Varandani.*

Plaintiff next argues that her exclusion was improperly based on a standard of care inapplicable to rural Belmont County, Ohio. Plaintiff argues that § 1156 imposes the obligation on practitioners "to provide care of a quality which meets professionally recognized standards" but does not further elaborate those standards. Plaintiff argues that the PRO panel included five physicians from Columbus, Ohio and one from Toledo, Ohio, all affiliated with major urban hospitals. She further argues that her performance should have been evaluated in terms of reasonable and appropriate care in rural Martins Ferry, Ohio and that there is no indication in the PRS submittal to the OIG that she was so evaluated. Even if this claim is colorable, it is not collateral and is the kind of error which should be addressed in the administrative appeal process. The agency should be given the opportunity to review and correct this claimed error in the particular factual context of this case. Ultimate judicial review of this issue would be significantly enhanced by the record made in the administrative review process. The determination of the proper standard of care to be applied in evaluating a physician's conduct requires a factual determination. *See Campbell v. Oliva,* 424 F.2d 1244 (6th Cir. 1970).

Plaintiff next argues that the procedures followed by the PRO do not demonstrate compliance with the regulations adopted by HHS. Plaintiff argues that the record is silent as to how PRS reached its final recommendation after the June 4, 1987 meeting. She states that there are no minutes available of the meetings of the trustees and thus, no record of why and how the decision was reached. She claims that as a matter of due process she was entitled to have PRS follow the procedures and apply the criteria established by HHS and that it is not self-evident from the record of their proceedings that this was done. This claim is neither colorable nor collateral.

Plaintiff did receive a letter from PRS dated September 11, 1987 notifying her of its findings and its recommendation to the Department of Health and Human Services. She also received a document entitled "Final PRO Conclusions" which set forth the conclusions of PRS and the specific grounds for its conclusions including the facts relied on and two citations to a recognized medical text. Plaintiff alleges no facts which would indicate that PRS failed to follow the regulations adopted by the Department of Health and Human Servic-

es. Finally, even if there was evidence that PRS failed to follow HHS regulations, this is not a collateral claim which would authorize the Court to waive exhaustion under the standards of *Mathews v. Eldridge;* indeed, this is the very kind of claimed error which can and should be addressed in the administrative appeal process.

> Because of the agency's expertise in administering its own regulations, the agency ordinarily should be given the opportunity to review application of those regulations to a particular factual context. Thus, our holding today does not suggest that exhaustion is to be excused whenever a claimant alleges an irregularity in the agency proceedings.

*Bowen v. City of New York,* 476 U.S. at 485, 106 S.Ct. at 2032.

Plaintiff next argues that, as a member of the AMA, she is a third-party beneficiary of an agreement entered into between the government and the American Medical Association in the case of *AMA v. Bowen,* Civil Action No. 87–995, in the United States District Court for the District of Columbia. Plaintiff claims that this litigation was terminated by a settlement agreement which provided for several changes in the PRO sanction process. She claims that the government agreed to implement a revision in the sanction notification procedures which would give a provider-physician the option of informing his or her Medicare patients of the provider's exclusion from the Medicare program. Dr. Lavapies alleges that the government has refused to permit her to utilize this alternative procedure in the present case.

The government agrees that the settlement of *AMA v. Bowen* included a commitment by the OIG to seek a regulatory alternative to the current process of publishing notice of suspension in a local newspaper. This agreement is reflected in a press release issued by HHS on May 13, 1987, which reads in part as follows:

> In addition, the HHS Inspector General has agreed to seek a regulatory alternative to the current process of publishing local newspaper notices regarding physi-

cians excluded from Medicare. The change would permit such physicians to personally inform their Medicare patients that Medicare would no longer pay for the physicians' services.

The government states that it has begun the process of preparing a notice of proposed rule-making to implement this agreement but that until it is complete, Dr. Lavapies remains governed by the provisions of 42 C.F.R. § 1004.100(d) which requires that the public be informed by notice in a newspaper of general circulation.

The Court notes, however, that a year has elapsed since the settlement of *AMA v. Bowen.* Defendants have offered no explanation for the delay in implementing a modification of the notice regulations. The Court concludes that this claim is colorable and collateral to the merits, that exhaustion would be futile and that irreparable harm to the plaintiff's reputation would occur pending exhaustion. These determinations, however, do not fully answer the question of jurisdiction as it relates to this claim since, unlike the other claims asserted by the plaintiff, this one, on its surface at least, does not come within the grant of jurisdiction contained in 28 U.S.C. § 1331:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

This claim arises under an agreement between the HHS and various organizations including the American Medical Association and not under the laws, treaties or Constitution of the United States. Similarly, jurisdiction cannot be based upon 42 U.S.C. § 1983, which provides a vehicle for redress of a deprivation of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

District courts have jurisdiction under 28 U.S.C. § 1346 over claims against the United States founded upon express or implied contract. However, even if the settlement agreement is construed as a contract with the United States, § 1346 provides jurisdiction only over a claim for money damages, not for injunctive relief as sought by plain-

tiff. *O'Connor v. Yezukevicz,* 589 F.2d 16 (1st Cir.1978).

■ District courts have original jurisdiction in the nature of mandamus under 28 U.S.C. § 1361 "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." However, the statute does not provide an independent ground for federal jurisdiction, but merely provides an additional remedy where subject-matter jurisdiction exists. *Starbuck v. City & County of San Francisco,* 556 F.2d 450 (9th Cir. 1977); *Smith v. Lehman,* 533 F.Supp. 1015 (E.D.N.Y.1982). In addition, the remedy of mandamus is a drastic one to be invoked only in extraordinary cases. *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). A party seeking mandamus must show that the public official has a plain duty to perform certain acts, that the party has a right to have those acts performed and that there exists no other adequate remedy by which the party's rights can be vindicated. *Holmes v. United States Board of Parole,* 541 F.2d 1243 (7th Cir.1976); *Ames–Ennis, Inc. v. Midlothian Limited Partnership,* 469 F.Supp. 939 (D.Md.1979).

■ Plaintiff has not plead facts or otherwise demonstrated that the Secretary has a plain duty to perform the requested acts or that plaintiff has a clear right to have those acts performed. Plaintiff has not shown that she has no adequate remedy at law. More importantly, this Court concludes that it does not have subject matter jurisdiction upon which to base a mandamus action under 28 U.S.C. § 1361.

Plaintiff alleges that she is a third-party beneficiary to a settlement agreement entered into between the Secretary of HHS and the American Medical Association in an action filed in the United States District Court for the District of Columbia. Generally, non-parties have no right of action based upon a settlement or consent decree. *Data Processing Financial & General Corp. v. Int'l Business Machines Corp.,* 430 F.2d 1277 (8th Cir.1970). It has been held that a consent decree is not enforceable directly or in collateral proceedings by those who were not parties to it even though they were intended to be benefited by it. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Nonetheless, non-parties who clearly have standing as beneficiaries of a prior order made in their favor have been granted leave to intervene in the original action pursuant to Fed.R.Civ.P. 24 as a real party in interest under Fed.R. Civ.P. 17 to obtain enforcement of the order. *See, e.g., South v. Rowe,* 102 F.R.D. 152 (N.D.Ill.1984), *rev'd in part on other grounds,* 759 F.2d 610 (7th Cir.1985).

An additional vehicle for intervention is found in Fed.R.Civ.P. 71, which provides in relevant part:

> When an order is made in favor of a person who is not a party to the action, he may enforce obedience to the order by the same process as if he were a party
>
> . . .

■ Under Rule 71, a non-party who establishes standing to proceed as a third-party beneficiary of a settlement agreement or consent decree may pursue enforcement of that agreement or decree. *See Berger v. Heckler,* 771 F.2d 1556 (2d Cir.1985); *Lasky v. Quinlan,* 558 F.2d 1133 (2d Cir.1977).

■ However, the proper forum in which to pursue these remedies is the District Court for the District of Columbia. It is well established that courts have the inherent power to enforce settlement agreements or consent decrees entered into in litigation pending before them. *Sarabia v. Toledo Police Patrolman's Ass'n,* 601 F.2d 914 (6th Cir.1979); *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368 (6th Cir. 1976). A district court retains jurisdiction after final judgment to enforce its judgments and settlements. *Joy Manuf. Co. v. Nat'l Mine Service Co.,* 810 F.2d 1127 (Fed.Cir.1987); *City of Las Vegas, Nevada v. Clark Cty., Nevada,* 755 F.2d 697 (9th Cir.1984). The court does not have to express an intent to retain jurisdiction over the case, for the retention of jurisdiction is assumed. *South v. Rowe,* 102 F.R.D. at 156. A district court can also enjoin paral-

lel actions in other federal courts during the pendency of the litigation before it or from relitigating a matter in which the court has entered final judgment. *Wood v. Santa Barbara Chamber of Commerce, Inc.,* 705 F.2d 1515 (9th Cir.1983).

It is the District of Columbia Court which has and which retains subject matter jurisdiction over the case in which the settlement was reached and over proceedings to enforce the judgment. It is also the court which is most familiar with the facts of that case and therefore would be best equipped to interpret the terms of the settlement agreement, to determine whether plaintiff has standing as a third-party beneficiary and to fashion an appropriate sanction for ensuring enforcement of the judgment. This Court does not have subject matter jurisdiction over plaintiff's claim under the settlement agreement, and it is therefore subject to dismissal. However, this Court will entertain a motion by plaintiff to transfer this claim to the District of Columbia Court.

At the hearing on plaintiff's application for a preliminary injunction, an issue was raised concerning plaintiff's right to a limited pre-exclusion hearing under the provisions of § 4095 of P.L. 100–203. Section 1156(b) of the Social Security Act, 42 U.S.C.. Section 1320c–5(b) was amended on December 22, 1987 by § 4095 of P.L. 100–203 to add new paragraph (5) which provides in part as follows:

(5) Before the Secretary may effect an exclusion under paragraph (2) in the case of a provider or practitioner located in a rural health manpower shortage area (HMSA) or in a county with a population of less than 70,000, the provider or practitioner adversely affected by the determination is entitled to a hearing before an administrative law judge (described in section 205(b)) respecting whether the provider or practitioner should be able to continue furnishing services to individuals entitled to benefits under this Act, pending completion of the administrative review procedure under paragraph (4). If the judge does not determine, by a preponderance of the evidence, that the provider or practitioner will pose a seri-

ous risk to such individuals if permitted to continue furnishing such services, the Secretary shall not effect the exclusion under paragraph (2) until the provider or practitioner has been provided reasonable notice and opportunity for an administrative hearing thereon under paragraph (4).

Under the terms of the amendment, it is applicable to an eligible practitioner who requests, within ninety days after the date of enactment, the hearing which it provides. Plaintiff has timely requested such a hearing.

Plaintiff's office is located in Martins Ferry, Belmont County, Ohio. She is engaged in the specialty of family practice. Belmont County has been designated as an HMSA in two specialties of medical practice: psychiatry and podiatry. Dr. Lavapies' practice includes patients who reside in Harrison and Monroe Counties, Ohio, each of which have populations of less than 70,000.

Plaintiff argues first that she is entitled to the benefit of P.L. 100–203 because she is located in Belmont County, which has been designated as an HMSA. She contends that she is entitled to the benefit of the law notwithstanding the fact that Belmont County has been designated an HMSA only in the medical specialties of psychiatry and podiatry, neither of which apply to her. She argues that under the literal wording of the statute, the Secretary was not authorized to declare a county an HMSA in only certain medical specialties and that once declared an HMSA a county holds that status for all medical practitioners in all areas of medical practice.

In establishing HMSA's, Congress authorized the Secretary to promulgate regulations establishing the criteria for their designation. 42 U.S.C. § 254e(b). The Secretary promulgated such regulations at 42 C.F.R. § 5.1 *et. seq.* (1987). In so doing, the Secretary determined that an HMSA should be designated according to the criteria established in a series of appendices to Part 5. 42 C.F.R. § 5.3 (1987). Those appendices contain criteria for the designa-

tion of an HMSA in each of seven areas of medical specialty, to wit: primary medical care, dentistry, psychiatry, vision care, podiatry, pharmacy and veterinary medicine. Dr. Lavapies, as a family practitioner, would come within the specialty definition of primary medical care. 42 C.F.R. Part 5, Appendix A, Part I.B.3 (1987).

 Regulations designating HMSA's according to these seven areas of medical practice were first published and adopted in 1978 and have remained in effect ever since. The statute and the regulations provide that an HMSA need not conform to the geographic boundaries of a political subdivision and should represent a rational area for the delivery of health services. 42 U.S.C. § 254e(a)(1)(A); 42 C.F.R. § 5.2 (1987). A county may receive an HMSA designation in some medical specialties but not others and different portions of the same county may receive HMSA designation in different areas of specialization. The Court concludes that the Secretary's decision to classify HMSA's according to medical specialties is logical and consistent with the congressional mandate. It may readily be perceived that a given geographical area may have a health manpower shortage in certain medical specialties while having an adequate or even excessive supply of practitioners in other areas of specialty. In this case, the Secretary has concluded that there is no health manpower shortage in the area of family practice in Belmont County. Plaintiff is not entitled to the benefit of P.L. 100–203 as a physician engaged in family practice in Belmont County.

 Plaintiff next argues that she is entitled to the benefit of P.L. 100–203 on the grounds that some of her patients reside in Harrison and Monroe Counties, each of which have populations of less than 70,000. Under P.L. 100–203, a county having a population of less than 70,000 is treated as an HMSA. However, in order to be entitled to the benefit of the law, the practitioner must be "located" in such a county. Dr. Lavapies is not located in Harrison County or Monroe County in any normal sense of that word. Her office is located in Belmont County. She has no other offices and she does not allege that she travels to any other county to provide medical care. Dr. Lavapies and her medical practice are located in Belmont County notwithstanding the fact that some of her patients may be located in the counties of Harrison and Monroe.

It may have been logical for Congress to have included provisions in P.L. 100–203 which would have provided its benefits to physicians who are located in a county which is not designated as an HMSA but provide substantial services to residents of counties which are HMSA's. Nevertheless, Congress chose to confine P.L. 100–203 to practitioners located in a county which qualifies as an HMSA. Congress did not further define "located" and the word must be given its usual and ordinary meaning. The Secretary has not adopted any regulations which would extend the benefits of P.L. 100–203 to practitioners who are located in an area not designated as an HMSA but who provide services to patients in an area which is designated as an HMSA. Through existing regulations, the Secretary may avoid absurd results by defining an HMSA as an area other than a geographical area. In this case, however, only one county, Belmont, has been designated an HMSA in two areas of medical specialty, neither of which apply to the plaintiff. The counties of Harrison and Monroe qualify as HMSA's under the statute by virtue of their population, but plaintiff is not located in either of those counties.

The Court concludes that plaintiff's argument that she is entitled to the benefit of P.L. 100–203 is collateral but is not colorable.

 In the Fifth and Sixth Causes of action set forth in her complaint, plaintiff alleges that the delegation of authority from the Secretary of HHS to the OIG to exercise the powers of the Secretary with respect to the Peer Review Improvement Act of 1982 was illegal and contrary to law, that the OIG's delegation of authority to its director of the Health Care Administrative Sanctions staff of the Office of Investigations is likewise illegal and contrary to law,

and finally that the delegation of decision-making authority to PRS was contrary to law.

Plaintiff's claim that the statute does not authorize the Secretary to delegate his authority and that the Inspector General is without authority to redelegate is without merit and is not a colorable claim. On May 13, 1983, the Secretary of HHS published the following notice in the Federal Register:

> [O]n April 18, 1983, the Secretary of Health and Human Services delegated to the Inspector General, with the authority to redelegate: (1) the authorit[y] for controlling fraud and abuse in the Department's Health Care Financing program under section ... 1156(b) ... of the Social Security Act ...

48 Fed.Reg. 21,662 (May 13, 1983). This authority to delegate and to authorize redelegation is within the Secretary's authority. *See Hall v. Marshall*, 476 F.Supp. 262 (E.D.Penn.1979), *aff'd* 622 F.2d 578 (3d Cir.1980) and cases discussed therein; *Wirtz v. Atlantic States Construction Co.*, 357 F.2d 442 (5th Cir.1966). It should be noted that the Secretary has not delegated any authority to the Peer Review Organization to impose sanctions upon a practitioner. The PRO only submits recommendations to the Secretary's delegate. It is the OIG which has the actual authority to impose sanctions.

The legislative history accompanying medicare legislation passed subsequent to the April 18, 1983 delegation, with authority to redelegate, indicates that Congress was both aware of and approved of the delegation of this authority to the Inspector General.

> In exercising her authority to enforce the price freeze [on customary and prevailing charges for physicians services] the conferees expect the Secretary would make use of the Office of Inspector General in a similar manner as the current delegation of responsibility with respect to program sanctions and civil money penalties ...

Legislative history, Medicare, and Maternal Child and Health Care Amendments, Deficit Reduction Act of 1984, Pub.L. No. 98–369, H.Rep. No. 98–861, 98th Cong.2d Sess. 757, 1315, *reprinted in* 1984 U.S.Code Cong. & Ad.News 697, 1445, 2003.

■ In her Ninth Cause of action, the plaintiff alleges that the administrative appeal procedures will not permit her to receive a timely adjudication, thereby depriving her of due process. This claim is not a colorable claim. Dr. Lavapies requested a hearing before an Administrative Law Judge on February 8, 1988. At the April 13, 1988 hearing in this matter, counsel advised the Court that the Administrative Hearing had been tentatively scheduled for the week of July 15, 1988 and that the Administrative Law Judge was considering a request from Dr. Lavapies to advance the hearing date. Where an appropriate pretermination hearing has been afforded, a delay in final adjudication does not violate due process, at least where the delay is not unreasonable. See *Cassim v. Bowen*, 824 F.2d 791 (9th Cir.1987); *Ritter v. Cohen*, 797 F.2d 119 (3rd Cir.1986).

Plaintiff's claim that she was not afforded due process with respect to the determination that she had demonstrated an unwillingness or inability to comply with her professional obligations under § 1156 of the Social Security Act is a colorable claim which is collateral to the issue of her suspension from the program. This claim satisfies the requirements for waiver of the requirement of exhaustion of administrative remedies under the Rule of *Mathews v. Eldridge*. Accordingly, the Court finds that it has jurisdiction of this claim. As to the remaining claims asserted in the complaint, the Court finds that it does not have jurisdiction. Thus, defendant's motion to dismiss is GRANTED in part and DENIED in part. The Court has also determined that the plaintiff does have a colorable collateral claim that she is entitled to the benefit of the new notice provisions agreed to by the Secretary in the case of *AMA v. Bowen*, and although this Court does not have jurisdiction of that claim, it has granted plaintiff leave to file a motion to transfer this claim to the United States District Court for the District of Columbia.

## APPLICATION FOR A PRELIMINARY INJUNCTION

The Court finds that plaintiff is entitled to a preliminary injunction. Four elements must be considered and carefully balanced in deciding whether to issue or withhold a preliminary injunction, they are:

1. Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.
2. Whether the movant has shown irreparable injury.
3. Whether the preliminary injunction could harm third parties.
4. Whether the public interest would be served by issuing the preliminary injunction.

*Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985), *quoting, Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th Cir.1977).

█ The probability of success that must be shown is inversely proportional to the degree of irreparable injury the plaintiff will suffer absent an injunction. However, the demonstration of a mere possibility of success is not sufficient and, at a minimum, the movant must show "serious questions going to the merits and irreparable harm which decidely outweighs any potential harm to the defendant ..." *State of Ohio ex rel Celebrezze v. NRC*, 812 F.2d 288, 290 (6th Cir.1987). Plaintiff has alleged that she received no pre-suspension hearing on the issue of her unwillingness or inability to meet her professional responsibilities under the Social Security Act, that she was not notified of the grounds for the allegation that she had demonstrated an unwillingness or inability to so comply, that she was not notified of the evidence the OIG would rely upon in making such a finding and that accordingly, she was denied the opportunity to present her side of this issue. Plaintiff has raised a serious question going to the merits, and she has demonstrated that she will sustain substantial harm, both financially and to her reputation if an injunction is not issued. Other than the evidence developed in the peer review proceeding, defendants did not offer any evidence that the plaintiff presents a serious risk of harm to her Medicare patients. The fact that defendants intend to suspend plaintiff from participation in the Medicare program only for a period of one year would seem to indicate defendants' belief that plaintiff is generally able to provide adequate care to her Medicare patients. Therefore, the Court concludes that the first requirement for issuing a preliminary injunction is met and that the plaintiff has demonstrated the requisite degree of likelihood of success in the context of the present case.

█ The Court concludes that the plaintiff has shown irreparable injury. The most compelling aspect of plaintiff's claim of irreparable injury is the harm to her professional reputation which will inevitably flow from the notice of suspension which will be published in a newspaper of general circulation in the community in which she practices. A subsequent vindication of plaintiff's position will likely not remedy that harm. Plaintiff will also sustain irreparable financial injury. Some Medicare patients will likely not return after being required to seek the services of other physicians during the one year suspension. When a patient decides not to consult Dr. Lavapies because of the publicity surrounding her suspension or when the hospital refuses to admit her patients because of the suspension, Dr. Lavapies will be unable to recover the fees she would have earned if it should later be shown that her suspension was improper.

It does not appear that the granting of a preliminary injunction would harm third parties. Here, there would be a legitimate concern about potential harm to Medicare patients if indeed Dr. Lavapies was practicing substandard medicine. Based upon the evidence, the Court could well conclude that Dr. Lavapies has been guilty of errors in medical judgment in certain specific cases. It has not been suggested, however, that she is unqualified to practice medicine and, as noted earlier, the fact that the sanction imposed in this case is a one year suspension implies that the Secretary believes that Dr. Lavapies is capable of providing acceptable medical care to her

**1212**

Medicare patients. Presumably, the one year suspension is intended to encourage her to carefully apply the skills she possesses. Neither the defendants nor the PRS have suggested any retraining is necessary. On the other hand, there was considerable evidence adduced at the hearing that the exclusion of Dr. Lavapies from the Medicare program will result in substantial harm to existing medical programs in the county in which she practices. The Court is unable to find that the issuance of a preliminary injunction would likely harm third parties; indeed, the evidence indicates that the contrary is more likely the case.

Finally, the Court concludes that the public interest would be served by issuing the preliminary injunction. If, indeed, Dr. Lavapies was entitled to but did not receive a proper pre-suspension hearing on the important issue of her willingness and ability to comply with professional standards, then the public interest would be served by requiring such a hearing before she is suspended from the Medicare program. The evidence revealed that the exclusion of Dr. Lavapies from the Medicare program would have adverse consequences to important medical programs in the rural county in which she practices.

Plaintiff's application for a preliminary injunction is GRANTED and defendants are preliminarily enjoined until further order of this Court from effecting or giving notice of Dr. Lavapies' exclusion from participation in the Medicare program. Bond in this matter is set at $1,000.

It is so ORDERED.